UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| CHIQUITA JOYNER, HELEN DIXON, and TAJAHNE HOBLEY, on behalf of themselves and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> FRONTIER AIRLINES, INC., a Colorado corporation; SIMPLICITY GROUND SERVICES LLC, D/B/A MENZIES AVIATION, a Delaware limited liability company; and AIRCRAFT SERVICE INTERNATIONAL, INC., D/B/A MENZIES AVIATION, a Delaware corporation, <br><br> Defendants. | Case No.: 1:24-cv-1672-KAS |

**THE MENZIES DEFENDANTS'
MOTION TO COMPEL ARBITRATION**

1

Defendants Simplicity Ground Services LLC, d/b/a Menzies Aviation ("SGS") and Aircraft Service International, Inc., d/b/a Menzies Aviation ("ASI") (collectively, the "Menzies Defendants") file this Motion to Compel Arbitration (the "Motion") pursuant to the Federal Arbitration Act, 9 U.S.C. § 3 (the "FAA").

## I.     INTRODUCTION

Plaintiffs are three former employees of the Menzies Defendants[1] who each executed contractual agreements to individually arbitrate all disputes relating to employment with the Menzies Defendants (the "Arbitration Agreements"). The Arbitration Agreements encompass the dispute at issue and apply to any and all claims arising out of the Plaintiffs' individual employment relationships, expressly including state law claims concerning wages, benefits, and meal and rest breaks.

Based on the Arbitration Agreements, the Menzies Defendants respectfully request that the Court enter an order compelling the Plaintiffs to individually arbitrate their claims in compliance with the Arbitration Agreements they executed.

## II.    Relevant Factual Background

### A. **Plaintiffs and Menzies Enter into Binding Arbitration Agreements**

Plaintiffs Chiquita Joyner ("Joyner") and Tajahne Hobley ("Hobley") began

---

[1] The Menzies Defendants aver that Plaintiffs are only Menzies employees, and Defendant Frontier Airlines, Inc. ("Frontier") is not a joint employer. However, Frontier is a third-party beneficiary of Plaintiffs' obligation to individually arbitrate their claims because any claims they could assert against Frontier can only come under the auspices of joint employment allegations. The Menzies Defendants anticipate that Frontier will file a separate motion joining in this Motion and asserting its own argument in support of the obligation to arbitrate.

2

working for Menzies in July 2022. (Dkt. No. 6, Individual and Class Action Complaint and Jury Demand ("Compl.") ¶ 1). Plaintiff Helen Dixon ("Dixon") began working for Menzies in October 2022. *Id*. Plaintiffs each executed the Arbitration Agreements at the outset of their respective employments. (Movant's Appx., p. 2 – Bazerkanian Decl.; pp. 4-9 – Arbitration Agreements) The Arbitration Agreements require Plaintiffs to pursue their claims in individual arbitration proceedings. *Id*.

Defendants SGS and ASI are both part of the larger Menzies Aviation enterprise and share a common corporate parent in the US – Menzies Aviation, Inc. (Movant's Appx., p. 2 – Bazerkanian Decl.) As a consequence, SGS and AMI share certain policy materials and documents, such as the Arbitration Agreements.  (*Id*.)

### B. **Plaintiffs were Customer Service Agents Primarily Responsible for Customer Check-In and Checking Customer Identification Paperwork and Boarding Passes**

Plaintiffs were employed by the Menzies Defendants as Customer Service Agents ("CSAs"). (Movant's Appx., p. 10 – Moreo Decl.). Menzies maintains a job description for CSA's nationally, which Plaintiffs received and signed, but that job description – especially the language regarding handling of customer baggage – does not capture the unique nature of the CSAs' job duties in Denver. (Movant's Appx., p. 15 – CSA Job Description.) Specifically, in Denver, Menzies' CSAs work in one of two primary locations, either at the check-in and ticketing counter station or at individual gates on the traveling-passenger side of TSA security checkpoints. (Movant's Appx., p. 10 – Moreo Decl.). CSAs at the check-in and ticketing counter station rotate

3

between three sub-stations, the kiosk, bag drop, and agent-assist counters. (*Id.*).

When working the kiosk, CSAs verbally instruct customers on printing bag tag stickers and how to attach those bag tags to their checked bags. ( Movant's Appx., p. 10 – Moreo Decl.). While CSAs may infrequently assist customers in putting tags on their bags, <u>they do not actually pick up customer baggage or move it onto a conveyor belt or other location</u> while assisting customers at the kiosk. (*Id.*). The kiosks also aid the CSAs in verbally and visually instructing customers how to place their bags on the automated scales/conveyor belts at either the bag drop or agent-assist counters, and CSAs <u>are not responsible for or involved in moving or transporting the customers' bags from the kiosk area to either subsequent counter</u>. (*Id.*). Rather, the customers themselves handle and move their own bags. (*Id.*). A video exemplifying a typical interaction between Customer Service Agent and customer at the kiosk is produced with this Motion and showcases that CSAs do not handle, pick up, or move customer baggage at the kiosk. (*Id.*; *see also* Movant's Appx., p. 24 – kiosk video).

At the bag drop counter, a CSA's primary duty is to check customer identification paperwork and boarding passes while the customers place their checked baggage onto an automated scale/conveyor belt system. (Movant's Appx., p. 11 – Moreo Decl.). Just as at the kiosk, CSAs at the bag drop counter <u>are not responsible for picking up, handling, or moving customer baggage onto the conveyor belt system</u> that ultimately results in the baggage reaching other individuals (who are not CSAs) responsible for loading the baggage onto the aircraft. (*Id.*). Rather, the

4

customers themselves place their bags onto the conveyor, which includes a built-in scale to ensure the bags meet weight limits. (*Id.*). For customers with bags exceeding weight limits, the CSA verbally directs the customer to remove their bag from the scale and either redistribute the weight to another checked bag or proceed to the agent assist counter to pay the fee for overweight bags. (*Id.*). A video exemplifying a typical interaction between CSAs at the bag drop counter and customers handling their own bags is produced herewith and showcases that CSAs do not handle, pick up, or move customer baggage. (*Id.*; *see also* Movant's Appx., p. 25 – bag drop video).

The agent-assist counter is a catch-all for customers unable to tag their own bags at the kiosk and/or utilize the bag drop counter. (Movant's Appx., p. 12 – Moreo Decl.). This includes customers with oversized or overweight bags, need a physical ticket printed for them, missed their flight, or need to book a new flight. (*Id.*). For overweight bags, similar to the bag drop counter, customers themselves place the bags on the scale/conveyor belt and pay the overweight bag fee. (*Id.*). For oversized bags, an airport worker referred to as a "porter" – <u>who is not employed by Menzies</u> – is responsible for handling the oversized bag and ensuring it is loaded onto the correct aircraft. (*Id.*). A video exemplifying a typical interaction between a CSA and customer at the agent-assist station is produced with this Motion and showcases that Customer Service Agents do not handle, pick up, or move customer baggage at the agent-assist station. (*Id.*; *see also* Movant's Appx., p. 26 – agent assist video).

On rare occasions, at either the bag drop counter or agent assist counter, a

5

Customer Service Agent may help a customer load their bag onto the conveyor belt system, primarily if the customer is of an advanced age or suffers from a physical limitation and demonstrates a need for manual assistance. (Movant's Appx., p. 12 – Moreo Decl.). This minimal contact by Customer Service Agents with customer bags occurs with less than 1% of all checked baggage of Frontier customers and is intentionally discouraged and limited by Menzies to avoid liability issues based on claims that the Customer Service Agent caused damage to customer bags. (*Id.*).

At the customer gates, Customer Service Agents are responsible for checking customer boarding passes and ensuring carry-on bags do not exceed size limitations. (Movant's Appx., p. 13 – Moreo Decl.). Customer Service Agents will instruct customers to place bags perceived to be over the size limitations into a "bag sizer" to ensure it does not exceed size limits. (*Id.*). Customer Service Agents are expressly discouraged from touching customer carry-on bags to avoid liability issues if the bag sizer rips or tears the bag. (*Id.*). If a bag is deemed oversized, the Customer Service Agent will print a bag tag and, similar to the kiosk station, instruct the customer to place the bag tag on the bag and then drop their bag off at the end of the boarding ramp before boarding the plane. (*Id.*). After the customer drops the bag off at the end of the boarding ramp, a ramp agent (not a Customer Service Agent) handles the loading of the carry-on bag onto the airplane. (*Id.*). <u>At no point during the process should a Menzies Customer Service Agent carry, move, or otherwise transport a customer bag that has been gate-checked onto the aircraft</u>. (*Id.*).

6

### C. Plaintiffs Allege that they were Improperly Compensated Under the Colorado Wage Claim Act

Plaintiffs allege that Menzies failed to follow Colorado wage and hours laws with respect to overtime, rest and meal periods, meal break deductions, and earned commissions for checked bags for its Customer Service Agents. (Compl. ¶ 2(a)-(e)). All such claims are brought pursuant to the Colorado Wage Claim Act, C.R.S. § 8-4-101 *et seq*. (the "Wage Claim Act"). Plaintiffs allege that as a result of Menzies actions, they and other CSAs are owed unpaid wages and commissions. (Compl. ¶ 4).

### D. Case Status

Plaintiffs filed the Complaint in Colorado state court on May 14, 2024. (Dkt. No. 6). The Menzies Defendants answered on June 7, 2024. (Dkt. No. 8). This case was removed to this Court on June 14, 2024. (Dkt. No. 1). Now, the Menzies Defendants move to compel Plaintiffs' claims to arbitration pursuant to the FAA.

### III. Argument and Authorities

### A. The Court Should Compel Plaintiffs' Claims to Arbitration

On April 27, 2011, the Supreme Court issued its landmark ruling in *AT&T Mobility, LLC v. Concepcion* clarifying that the FAA makes enforceable agreements requiring parties to resolve claims through arbitration on an individual basis. *See* 563 U.S. 333, 344 (2011) (the "principal purpose of the FAA is to ensure that private arbitration agreements are enforced according to their terms") (internal quotation marks and citations omitted); *see also* 9 U.S.C. § 2; *Perry v. Thomas*, 482 U.S. 483, 489 (1987); *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000). The

7

FAA's coverage is sweeping, reflecting an "exercise [of] Congress' commerce power to the full." *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 277 (1995). Section 2 of the FAA provides that every arbitration agreement set forth in a "contract evidencing a transaction involving commerce … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This expansive wording "compels judicial enforcement of a wide range of written arbitration agreements," including those found in employment contracts. *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 111, 113-14 (2001).

On May 21, 2018, the United States Supreme Court issued its decision in *Epic Systems Corp. v. Lewis*, a case similar to the instant action in which the plaintiff in *Epic Systems* signed an arbitration agreement with her employer but still pursued civil claims in court. *See* 584 U.S. 497, 503-11 (2018). The Supreme Court held that, even in the employment context, "[i]n the [FAA], Congress has instructed federal courts to enforce arbitration agreements according to their terms—including terms providing for individualized proceedings." *Id*. at 502. As in *Epic Systems*, Plaintiffs and the Menzies Defendants contracted for individual arbitration and specified the rules that would govern the arbitrations, such that the Arbitration Agreement must be enforced; "this much the Arbitration Act seems to protect pretty absolutely." *Id*. at 506; (Movant's Appx., p. 2 – Bazerkanian Decl.; pp. 4-9, Arbitration Agreements).

### B. The Arbitration Agreement is Enforceable

Colorado law favors the resolution of disputes through arbitration. *J.A. Walker*

8

*Co. v. Cambria Corp.*, 159 P.3d 126, 128 (Colo. 2007) (en banc). Colorado courts considering motions to compel arbitration engage in a two-step inquiry: (1) the court must determine whether the parties agreed to arbitrate the dispute; and (2) the court must then determine whether any statute or policy renders the claims non-arbitrable. *Stender v. Cardwell*, No. CIV 07-CV-02503-REBM, 2010 WL 1930260, at *5 (D. Colo. May 12, 2010); *Williams v. Imhoff*, 203 F.3d 758, 764 (10th Cir. 2000). Here, the Arbitration Agreements constitute clear and enforceable agreements to arbitrate and there are no statutes or policies rendering those agreements non-arbitrable.

### i. **Plaintiffs Agreed to Arbitrate All Employment Disputes**

Courts determining the validity and enforceability of arbitration agreements apply general state law principles of contract interpretation. *Turner v. Chipotle Mexican Grill, Inc.*, No. 14-CV-02612-JLK, 2018 WL 11314701, at *2 (D. Colo. Aug. 3, 2018) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (noting that courts should "apply ordinary state-law principles that govern the formation of contracts" when determining whether parties agreed to arbitrate). Courts must enforce arbitration agreements "save upon grounds as exist at law or in equity for the revocation of any contract." *Turner*, 2018 WL 11314701, at *2; 9 U.S.C. § 2. Where the parties sign an agreement agreeing to submit "all disputes" to binding arbitration, a valid arbitration agreement exists. *Clark v. Colorado Div. of Sec.*, No. 123CV02170SKCJPO, 2024 WL 1719450, at *3 (D. Colo. Apr. 22, 2024).

Here, each of the Plaintiffs entered into valid and enforceable Arbitration

9

Agreements with the Menzies Defendants. (Movant's Appx., p. 2 – Bazerkanian Decl.; pp. 4-9 – Arbitration Agreements). The Arbitration Agreements contain express statements that the Plaintiffs agreed to arbitrate "disputes relating to my employment and the terms and conditions of my employment . . . including but not limited to my compensation, wages, claims alleging failure to compensate for all hours worked, failure to pay overtime, failure to pay minimum wage, . . . failure to provide meal and/or rest breaks, and/or other claims involving employee wages . . ."). (*Id.*). This constitutes an express agreement to arbitrate all claims arising out of employment with the Menzies Defendants. Such an express agreement is binding and enforceable and encompasses all claims asserted.

Notably, the Arbitration Agreements further contain a procedure permitting the Plaintiffs to opt out of Menzies' arbitration policy by submitting a written opt out request to Menzies' human resources department during employment, and an express statement that "failure to opt out will demonstrate my intention to be bound"). (*Id.*). None of the Plaintiffs exercised this option to opt-out of the Arbitration Agreements during their employment with the Menzies Defendants. *Id.* This further demonstrates the validity and enforceability of those agreements.

    **ii.**    **There are no Statutes or Policies that Would Deny Enforcement of the Arbitration Agreements**

The Menzies Defendants anticipate Plaintiffs will assert two arguments against compelling arbitration: (1) that Plaintiffs are "transportation workers" subject to the FAA's Section 1 residual clause excepting such workers from the FAA;

10

and (2) that the Colorado Wage Claim Act contains a provision prohibiting mandatory arbitration of Wage Claim Act claims. Both of these arguments fail.

### 1. The FAA's Residual Clause does not Apply Because Plaintiffs are not Transportation Workers

The transportation worker exception in Section 1 of the FAA, sometimes referred to as the residual clause, is a narrow exclusion for a limited class of "transportation workers" to which the Plaintiffs do not belong. *Circuit City*, 532 U.S. at 118, ("[T]he § 1 exclusion provision [is] afforded a **narrow** construction") (emphasis added). The Supreme Court's recent *Saxon* opinion provides a two-step framework to analyze whether workers qualify as "transportation workers" pursuant to the FAA's residual clause. *Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 456 (2022).

First, the court must focus on the particular workers involved and the actual work they perform – not the environment where the workers carry out their duties or the employer's industry of operation. *Id.* at 456 ("Saxon is [] a member of a 'class of workers' based on what she does at Southwest, not what Southwest does generally").

Second, courts must consider two practically-focused, easy-to-apply principles to identify transportation workers covered by Section 1 of the FAA from all other workers to whom the FAA applies: (1) transportation workers must themselves have "direct involvement" and "active engagement" in the transportation of goods in interstate commerce, best understood as doing the physical (hands-on) loading and unloading of the goods or cargo; and (2) the workers' direct, physical contact with and movement of "goods" or "cargo" must be a frequent part of the job and critical job

11

responsibility. *Id.* at 456-57 ("Her work ***frequently*** requires her to ***load and unload*** baggage. . .") (ramp agents "***physically load and unload*** baggage . . ."") ("***Frequently***, ramp supervisors step in to ***load and unload*** cargo") ("Saxon belongs to a class of workers who ***physically load and unload*** cargo . . . on a ***frequent*** basis") ("We think it equally plain that airline employees who ***physically load and unload*** cargo on and off planes traveling in interstate commerce are, as a practical matter, part of the interstate transportation of goods") ("Likewise, any class of workers that ***loads or unloads*** cargo on and off airplanes bound for a different State or country is 'engaged in foreign or interstate commerce'") (emphasis added).[2]

As shown above, the work performed by Menzies' CSAs in Denver bear **none** of the hallmarks of the duties necessary for qualification as a transportation worker – particularly when measured against the Supreme Court's instruction that courts must narrowly construe the exception. Specifically, CSAs have virtually no direct and physical involvement in the process of customer baggage making its way to aircraft and no involvement whatsoever in loading baggage onto the aircraft. *Saxon*'s repeated invocation of language demanding frequent "direct involvement" and "active engagement" in the physical loading and unloading of baggage onto the appropriate

---

[2] Merriam-Webster defines "directly" to mean "in immediate physical contact." *See* https://www.merriam-webster.com/dictionary/directly. It also defines "physically" to mean "in respect to the body." *See* https://www.merriam-webster.com/dictionary/physically?src=search-dict-box. Given these meanings involving "immediate physical contact" and use of the body, a class of workers logically cannot "physically" load or unload goods without having "hands-on" involvement with them.

12

aircraft is determinative and shows why CSAs are not transportation workers.

Any arguments by Plaintiffs that CSAs may have some contact with customer baggage will not change the outcome. Beyond the inherent problem of being many steps removed from the actual loading and unloading of baggage onto aircraft, Plaintiffs simply cannot satisfy *Saxon*'s requirement that this involvement be a "frequent" part of a transportation worker's job duties. The recent First Circuit and subsequent district court decisions in *Fraga I* and *II* calls this inevitability into sharp focus and such decisions are highly instructive to the Court, which should reject any argument that incidental contact with baggage converts Plaintiffs into transportation workers. *See Fraga v. Premium Retail Servs., Inc.*, 61 F.4th 228, 236 (1st Cir. 2023) ("Fraga I"); *Fraga v. Premium Retail Servs., Inc.*, No. CV 21-10751-WGY, 2023 WL 8435180, at *5 (D. Mass. Dec. 5, 2023) ("Fraga II"). The *Fraga* cases consider whether the plaintiff, a retail worker who had ***some*** direct physical contact with goods and personally drove them across state lines, qualified as a transportation worker engaged in interstate commerce. *Fraga I*, 61 F.4th at 230. The First Circuit, interpreting *Saxon*, held that the party resisting arbitration bore the burden to demonstrate that they directly and ***frequently*** engaged in tasks constituting engaging in interstate commerce. *Fraga I*, 61 F.4th at 237. Because the frequency of Fraga's job duties of handling and transporting retail goods were disputed, the First Circuit remanded the case for further fact finding. *Fraga I*, 61 F.4th at 237. After careful scrutiny of the evidence, the district court subsequently compelled the claims

13

to arbitration because Fraga could only demonstrate that such direct contact with goods in interstate commerce occurred a couple of times a week for no more than an hour at a time, which the district court held was <u>*insufficiently frequent*</u> to fall within the narrow residual clause exception to the FAA. *Fraga II*, 2023 WL 8435180 at * 5.

CSAs in Denver do not have remotely the same frequency of contact with customer baggage as the plaintiff in *Fraga I and II* did with the goods at issue therein – a frequency insufficient to quality her as a transportation worker. Plaintiffs accordingly are not exempt from arbitration under the FAA's residual clause exception because they did not directly and frequently engage in the kinds of work activities constituting active engagement in interstate commerce as instructed by *Saxon*. The fact that Plaintiffs worked at an airport or that Frontier and the Menzies Defendants are generally involved in the aviation industry is not what matters; the Plaintiffs' actual job duties are what matters. *See Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246, 255-56, 144 S. Ct. 905, 912-13, 218 L. Ed. 2d 204 (2024) (a worker's or employer's industry does not dictate whether he or she is a transportation worker, the focus is on the worker's job duties). As CSAs, Plaintiffs were primarily responsible for verbally instructing customers on how to check-in their own bags, assessing identification documents and boarding passes, and otherwise assisting with customer ticketing needs. (Movant's Appx., pp. 10-14 – Moreo Decl.). Any direct contact with customer bags was exceptionally infrequent, involving less than 1% of all bags that pass through the check-in and ticketing

14

counters, with the vast majority of customers' bags being handled by the customers themselves and the automated conveyor equipment before being handled by non-CSAs, such as cargo loaders or ramp agents. (*Id.*). Indeed, Menzies directs CSAs – including Plaintiffs – not to have contact with customer baggage except where necessary to assist customers of advanced age or disability to avoid customer complaints and risk of liability arising from any damage to the baggage. (*Id.*).

Because Plaintiffs cannot demonstrate that they directly and frequently engaged in the performance of work qualifying as engaging in interstate commerce, they will not qualify as transportation workers, they do not fall within the FAA's Section 1 exclusion, and this Court should compel their claims to arbitration.

### 2. **The FAA Preempts the Conflicts with Rights Clause of the CWCA**

The Menzies Defendants also anticipate that Plaintiffs will argue that an agreement to arbitrate claims arising under the Colorado Wage Claim Act, C.R.S. §§ 8-4-101 *et seq.*, is void based on the Colorado Supreme Court decision in *Lambdin* and because the Wage Claim Act contains a clause purporting to void all arbitration agreements that conflict with the rights established by the Wage Claim Act, namely the right to bring a civil action in Colorado state court (the "Conflict with Rights Clause"). *See Lambdin v. Dist. Ct. In & For 18th Jud. Dist. of Cnty. of Arapahoe*, 903 P.2d 1126, 1130 (Colo. 1995); § 8-4-121, C.R.S. 2024. *Lambdin*, however, expressly declined to reach the issue of whether the **FAA** preempts the Conflict with Rights Clause, and subsequent Colorado state and federal court decisions make clear it does.

15

The FAA, and the U. S. Constitution's Supremacy Clause, prohibit states from passing laws preventing enforcement of arbitration agreements. 9 U.S.C. § 2; U.S. Const. art. VI, cl. 2; *Perry v. Thomas*, 482 U.S. 483, 484, 107 S. Ct. 2520, 2523, 96 L.Ed.2d 426, 432 (1987) (the FAA preempted a state statute that authorized action in state courts regardless of "any private agreement to arbitrate"). Numerous Colorado courts recognize the supremacy of the FAA, which preempts the Conflict with Rights Clause. *Brownlee v. Lithia Motors, Inc.*, 49 F. Supp. 3d 875, 882 (D. Colo. 2014) ("the Wage Act does not mandate a forum or venue, nor can it demand that a court (as opposed to an arbitrator) hear and decide Wage Act claims."); *Grohn v. Sisters of Charity Health Services Colorado*, 960 P.2d 722 (Colo.App.1998) (FAA required claims under the Wage Claim Act be arbitrated); *Byerly v. Kirkpatrick Pettis Smith Polian, Inc.*, 996 P.2d 771, 774 (Colo.App.2000) (same). Indeed, a contrary finding would directly contract the controlling instruction from *Perry* that the FAA preempts any state wage claim statute purporting to vest civil courts with the sole right to resolve state law wage claims. 482 U.S. at 484.

Here, Plaintiffs exclusively assert claims under the Wage Claim Act. (Compl. ¶ 2(a)-(e)) Plaintiffs' Arbitration Agreements expressly extend to state wage and hour claims. (Movant's Appx., p. 2 – Bazerkanian Decl.; pp. 4-9 – Arbitration Agreements) As such, the FAA and Supremacy Clause preempt the Conflict with Rights Clause. Thus, Plaintiffs' claims are properly compelled to arbitration under the FAA and pursuant to binding and enforceable Arbitration Agreements.

Dated: August 16, 2024

Respectfully submitted,

/s/ *Christopher Ward*
Christopher Ward
**Foley & Lardner LLP**
321 N. Clark Street, Suite 3000
Chicago, IL 60654
Tel: (312) 832-4500
Fax: (312) 832-4700
cward@foley.com

Michael F. Ryan
Foley & Lardner LLP
1400 16th Street, Suite 200
Denver, CO 80202
Tel: (720) 437-2000
Fax: (720) 437-2200
mryan@foley.com

*Attorneys for Simplicity Ground Services LLC, d/b/a Menzies Aviation and Aircraft Service International, Inc., d/b/a Menzies Aviation*

## CERTIFICATE OF CONFERRAL

I HEREBY CERTIFY that I conferred with counsel for Plaintiffs on July 15, 2024 and July 23, 2024 concerning this Motion to Compel Arbitration seeking Plaintiffs consent to arbitrate the claims pursuant to the Arbitration Agreements that Plaintiffs signed. Counsel for Plaintiffs responded on July 26, 2024 that Plaintiffs were opposed to this Motion because Plaintiffs do not agree that Plaintiffs' claims are subject to arbitration, despite the Arbitration Agreements, because Plaintiffs believe they qualify as transportation workers within the meaning of the FAA's Section 1 residual clause.

/s/ *Michael F. Ryan*
Michael F. Ryan

## CERTIFICATION RE: NON-USE OF ARTIFICIAL INTELLIGENCE

I HEREBY CERTIFY that no portion of this filing was drafted by Artificial Intelligence.

/s/ *Michael F. Ryan*
Michael F. Ryan

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this August 16, 2024, a true and correct copy of the foregoing **Motion to Compel Arbitration** was filed and served via CM/ECF on all parties of record.

/s/ *Christopher Ward*
Christopher Ward