IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-1672-SKC-KAS

CHIQUITA JOYNER,
HELEN DIXON, and
TAJAHNE HOBLEY, on behalf of themselves and all others similarly situated,

    Plaintiffs,

v.

FRONTIER AIRLINES, INC., a Colorado corporation;
SIMPLICITY GROUND SERVICES LLC, d/b/a MENZIES AVIATION, a Delaware limited liability company; and
AIRCRAFT SERVICE INTERNATIONAL, INC., d/b/a MENZIES AVIATION, a Delaware corporation,

    Defendants.

## PLAINTIFFS' RESPONSE TO THE MENZIES DEFENDANTS' MOTION TO COMPEL ARBITRATION

Plaintiffs, Chiquita Joyner, Helen Dixon, and Tajahne Hobley, on behalf of themselves and all others similarly situated ("Plaintiffs"), hereby file their Response to the Menzies Defendants' Motion to Compel Arbitration filed August 16, 2024, ECF No. 27 (Defendants' "Motion").

### I. INTRODUCTION

The Federal Arbitration Act ("FAA") does not apply because Plaintiffs and the workers they seek to represent fit within the carve-out for "transportation workers" who frequently play a direct and necessary role in the free flow of cargo across borders. After all, even if the approximately 207 ticket and gate agents currently employed by Defendants at Denver International Airport ("DIA") were involved in transporting a relative fraction of the 2 million tons of cargo handled by Defendants annually, would any portion of those goods traveling through DIA

actually make it to the destinations or get reunited with passengers without Defendants' agents controlling whether, how, or what cargo moved through those ticketing and gate checkpoints? *See* Pltfs.' Appx., p. 1 - Ex. A, Menzies Website Screenshot; *see also* ECF No. 1, ¶ 19.

Similarly, are Defendants' gate and ticketing agents who personally tagged and lifted passengers' goods destined for out-of-state travel 50-80% of the time – to ensure the goods do in fact make it into the interstate stream of transportation – any more so directly and necessarily engaged in interstate commerce compared to workers who instructed and controlled passengers' tagging and lifting of the goods themselves to ensure the goods make it to their out-of-state destinations? The answer is no because both descriptions represent classes of workers whose roles so directly impact the interstate travel of goods that the goods would not make it to their destinations without Plaintiffs, and the FAA therefore exempts them from coverage.

When the FAA does not apply, state law governs. The Colorado Wage Act ("CWA") voids agreements that purport to waive rights under the statute, including arbitration agreements that waive the right to bring CWA claims in court. Defendants' Motion should therefore be denied.

II.   **STANDARD OF REVIEW.**

Typically, "the party moving to compel arbitration bears the initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable agreement." *Bellman v. i3Carbon, LLC*, 563 Fed. App'x 608, 612 (10th Cir. 2014). If the FAA exempts Plaintiffs, Colorado law voids their arbitration agreements. Because the FAA's coverage determines if an agreement exists, Defendants must prove Plaintiffs are not exempt from the FAA.

Defendants' reliance on *Shearson/Am. Exp., Inc. v. McMahon* for the proposition that the "party opposing arbitration … bears the burden of demonstrating that they fall within an exemption under the FAA" is misplaced because *Shearson* involved the non-moving party's burden to "show

2

that Congress intended to preclude a waiver of judicial remedies for statutory rights at issue." 482 U.S. 220, 227 (1987). While several cases impose the burden on plaintiffs, they provide no analysis and cite cases involving different arguments against arbitration.[1] Plaintiffs are not in this case opposing arbitration under a federal statutory right to judicial remedies that conflict with the FAA. Plaintiffs are opposing arbitration because the FAA does not cover their arbitration agreements, and the applicable state law voids the agreements. Whether Plaintiffs fall into the exemption of § 1 of the FAA determines if the arbitration agreements exist such that the second analysis of whether they are void under Colorado law is warranted. Because the burden of proving the existence of an arbitration agreement is on the party moving to compel arbitration, the burden should be on Defendants to prove that Plaintiffs' arbitration agreements are covered by the FAA.

Plaintiffs agree that the FAA broadly enforces arbitration agreements. But, § 1 of the FAA denotes that "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce" are exempt from FAA coverage. 9 U.S.C. § 1; *Int'l Bhd. of Elec. Workers, Lc. #111 v. Pub. Serv. Co. of Colo.*, 773 F.3d 1100, 1106 (10th Cir. 2014). "[T]he existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked" and the party attempting to compel arbitration bears the burden of "demonstrating a valid arbitration agreement" exists. *Fundamental Admin Servs., LLC v. Patton*, 504 F. App'x 694, 698 (10th Cir. 2012) (citations omitted). "A court should decide for itself whether § 1's "contracts of employment" exclusion applies before ordering arbitration." *New Prime Inc. v. Oliveira*, 586 U.S. 105, 109-110 (2019).

---

[1] *See, e.g., Osvatics v. Lyft, Inc.*, 535 F. Supp. 3d 1, 9 (D.D.C. 2021) (imposing burden on plaintiff but relying on a concurring opinion in *Singh v. Uber Techs. Inc.*, 939 F.3d 210, 232 (3d Cir. 2019), which cited *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 92 (2000) (holding a party opposing arbitration as prohibitively expensive must show the likelihood of incurring costs)).

In *Southwest Airlines Co. v. Saxon*, the Supreme Court held airplane cargo loaders are "a class of workers engaged in foreign or interstate commerce." 596 U.S. 450, 455 (2022). The Court concluded that the loading and unloading of passenger cargo was part of the interstate or foreign transportation of that cargo. *Id.* To fall within this FAA exemption, a worker "must play a direct and 'necessary role in the free flow of goods' across borders. *Id.* at 451 (quoting *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 121 (2001)). A worker "must be actively 'engaged in transportation' of goods across borders via the channels of foreign or interstate commerce." *Id.* The question is "what the employee does at the [employer], not what the [employer] does generally. *Bissonnette v. Lepage Bakeries Park St., LLC*, 601 U.S. 246, 247 (2024) (citing *Saxon*, 596 U.S. at 456).

To be a transportation worker, "an employee's relationship to the movement of goods must be sufficiently close enough to conclude that his work plays a tangible and meaningful role in their progress through the channels of interstate commerce." *Ortiz v. Randstad Inhouse Servs., Ltd. Liab. Co.*, 95 F.4th 1152, 1160 (9th Cir. 2024). However, workers "who frequently perform transportation work do not have their transportation-worker status revoked merely because they also have other responsibilities." *Canales v. CK Sales Co., LLC*, 67 F.4th 38, 45 (1st Cir. 2023).

Here, Plaintiffs fall within a "class of workers engaged in foreign or interstate commerce" because Plaintiffs are ticketing and gate Customer Service Agents ("CSAs") who frequently receive, handle, control, and load cargo, as well as reuniting passengers with their cargo at their final destinations. *See* Pltfs'. Appx., pp. 2-7 - Ex. B, Joyner Decl.; pp. 9-11 - Exs. B-1-B-3, January 2023 Videos 1-3; pp. 12-15 - Ex. C, Dixon Decl.; pp. 17-20 - Ex. D, Hobley Decl. Plaintiffs are just like airplane cargo loaders directly involved in interstate and foreign commerce. To begin with, Defendants correctly do not contend there is any requirement that the workers themselves "physically accompany freight across state or international boundaries." *Saxon*, 596 U.S. at 460;

4

*Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 915 (9th Cir. 2020). The question is instead whether the workers are "directly involved in" the transportation of goods crossing state borders. *Saxon*, 596 U.S. at 457; *Rittmann*, 971 F.3d at 910.

As explained further below, gate and ticketing CSAs spend a majority of their time each shift directly handling cargo, which is necessary to make sure the cargo gets loaded and unloaded onto or from the airplanes. While *Saxon* held the transportation-involved part of a worker's job, such as loading and unloading airplane cargo, need only be "frequent," and it also explained that, if a ramp supervisor like Saxon filled in as a ramp agent *up to a maximum amount* of three shifts per week, his involvement with interstate transportation would be sufficiently frequent. *Saxon*, 596 U.S. at 456. Thus, even workers who spend multiple entire shifts per week doing activities other than handling cargo to load and unload that cargo from the airplanes are sufficiently engaged in interstate commerce for purposes of § 1's exemption. *See id.* Plaintiffs here spend 50-80% of their time directly and necessarily handling cargo. *See* Pltfs'. Appx., pp. 6-7 - Ex. B, Joyner Decl.; p. 15 -- Ex. C, Dixon Decl.; pp. 17-20 - Ex. D, Hobley Decl. This readily satisfies the "frequent" interaction requirement with goods moving in interstate channels under *Saxon*. *See id.*

### III. PLAINTIFFS' TRANSPORTATION WORK.

Plaintiffs each, with their own hands, transported cargo along Defendants' conveyor belts, outside drops, and jet bridges to the airplanes either every shift, or at least more than 50% of the time while working. *See* Pltfs'. Appx., pp. 6-7 - Ex. B, Joyner Decl. ("I conservatively believe I ended up having to personally handle, lift, haul, and/or carry cargo more than 50% of the time while working, and that frequency increased very significantly when we were short-staffed or the lines were backed up, which was often."); p. 15 - Ex. C, Dixon Decl. ("I believe I end up having to personally handle, lift, haul, and/or carry passenger cargo 50%-80% of the time while working,

5

…"); p. 17 - Ex. D, Hobley Decl. ("Every day I worked for Defendants, I directly received, handled, lifted, loaded, and controlled the cargo transported on the airplanes flying in and out of DIA."). Defendants employed Ms. Joyner as a ticketing CSA between July 25, 2022 through August 24, 2023; and Defendants currently employ Ms. Dixon as a ticketing CSA, a position she has worked in since approximately October 10, 2022. *Id.* at p. 2 - Ex. B, Joyner Decl.; p. 12 - Ex. C, Dixon Decl. Defendants employed Ms. Hobley as a gate CSA between July 25, 2022 through December 31, 2023. *Id.* at p. 17 - Ex. D, Hobley Decl.

Clearly, the cargo that gets loaded onto and off the Frontier airplanes for which Defendants provide ground services is being transported across state lines. *Id.* at p. 26 - Ex. E, Menzies' Website Screenshot Describing Ground Services (noting passenger service agents provide "check-in to gate" experiences, including "assisting with baggage"). Ticketing CSAs such as Ms. Joyner and Ms. Dixon are the first step in cargo getting from point A, the ticketing counters, to point B, the airplanes. *Id.* at pp. 2-7 - Ex. B, Joyner Decl.; pp. 12-15 - Ex. C, Dixon Decl. They physically handle and tag cargo, lift it onto conveyor belts and onto scales, reposition it on the belts, carry and haul it onto flat beds designated for certain cargo, and carry it to outside drops to get it physically loaded onto the airplane. *Id.*

Even on the infrequent occasions when Ms. Joyner and Ms. Dixon have not placed their hands physically on passenger cargo at the ticketing area, they are responsible for controlling how, what, and whether cargo gets past the ticketing area, often sorting and inspecting cargo and otherwise controlling it through verbal instructions to passengers, without which the cargo would not get transported from point A to point B, let alone its final destination. *Id. See also* pp. 9-11 – Exs. B1-B3, January 2023 Videos 1-3. In other words, if ticketing CSAs did not exist, cargo going through DIA would not make it onto the airplane or through interstate commerce.

6

The job description for CSAs similarly provides that Plaintiffs are "responsible for … checking baggage[.] Defs'. Appx., pp. 15, 18, 21 – Ex. F, Job Descriptions. Plaintiffs' "Key Responsibilities" included "[i]nterpret[ing] identification labels along with baggage and cargo routing tags[,]" "[h]ost[ing] self-service kiosks[,]" and being "[c]omfortable lifting/moving up to 70 lbs. of cargo and baggage[.]" *Id.* With respect to lifting/moving cargo and baggage, Defendants emphasize that the "physical demands here are representative of those that must be met by an employee to successfully perform the essential functions of this job[,]" and "[o]ther tasks include lifting passenger bags up to 70 lbs. which could also involve bending and stooping*. **The employee must frequently lift and/or move up to 25 lbs.*** and occasionally lift and/or move up to 70 pounds." *Id.* at pp. 16, 19, 22 (emphasis added). Consistent with Defendants' own requirements, Plaintiffs were required to and did frequently lift and/or move cargo to transport it from point A to point B, even physically taking cargo along the entire jet bridge (i.e., the walkway from the gate to the airplane) to the edge of the plane itself. *See* Pltfs'. Appx., pp. 17-20 - Ex. D, Hobley Decl.

Gate CSAs physically transport cargo from point A, the gate, to point B, the airplane, every shift they work. *Id.* Defendants even require gate CSAs to confront passengers to meet a quota of three checked items of cargo per flight, which they do by controlling and identifying what cargo can pass to the airplane, how it can be transported to the airplane, what tags are required for cargo, and what fees are required for cargo to reach the airplane. *Id.* After doing all of that, gate CSAs physically carry or walk the cargo down the jet bridge to drop it off at the airplane. *Id.* It is the same every flight and every shift. *Id.* Just as in *Saxon*, Plaintiffs and Defendants' CSAs therefore directly and frequently carry out the final, intrastate, legs of the broader interstate journey to fall within the exemption for transportation workers. *See Saxon*, 596 U.S. at 463 (concluding that airplane cargo loaders "plainly do perform activities within the flow of interstate commerce when

7

they handle goods traveling in interstate and foreign commerce, either to load them for air travel or to unload them when they arrive.") (quotations omitted).

IV. **LEGAL ARGUMENT.**

A. **The FAA Exempts Plaintiffs Because They Form a Direct Link in the Transportation of Cargo Across Interstate Borders.**

Focusing on these workers' roles in the flow of goods in interstate commerce, like the Court did in *Saxon*, it is clear Plaintiffs' handling, hauling, lifting, and loading of goods, as well as their control of how and whether such goods make it through interstate commerce, makes them a direct and necessary link in the chain that results in such goods crossing interstate borders. *See Saxon*, 596 U.S. at 461-63; *Bissonnette*, 601 U.S. at 255-56; *Rittman*, 971 F.3d at 916-17. *Saxon* cites to *Rittman*, contrasting it with a case where § 1's exemption did not apply, noting "the answer will not always be so plain when the class of workers carries out duties further removed from the channels of interstate commerce or the actual crossing of borders." 596 U.S. at 457 n.2. The Supreme Court denied certiorari in *Rittman*. *Amazon.com, Inc. v. Rittman*, 141 S. Ct. 1374 (2021).

Many courts have applied § 1's exemption and *Saxon* to workers like Plaintiffs who form a constituent part of the movement of goods across interstate borders. *See, e.g., Ortiz v. Randstad Inhouse Servs., LLC*, No. ED CV 22-01399 TJH (SHKx), 2023 WL 2070833, at *4 (C.D. Cal. Jan. 18, 2023) (exempting employee who "used a pallet jack to move packages that arrived at the warehouse – that someone else might have, first, removed from a shipping container – to warehouse racks for temporary storage before the packages were shipped out to customers and retailers [and] later, moved those packages from storage to a 'drop zone' as part of the process of preparing the packages to leave the warehouse."), affirmed by *Ortiz v. Randstad Inhouse Servs., LLC*, No. 23-55147, 2024 WL 1070823 (9th Cir. Mar. 12, 2024); *Lopez v. Aircraft Serv. Int'l, Inc.*,

8

No. CV 21-7108-DMG (EX), 2022 WL 18232726, at *3 (C.D. Cal. Jan. 18, 2023) (exempting Defendants' cargo plane fueling station employee) (citing *Writz v. B.B. Saxon Co.*, 365 F.2d 457, 461 (5th Cir. 1966) (holding "there can be no question" that employees who hauled fuel to planes that transported goods in interstate commerce were "engaged in commerce" for purposes of the [FLSA] because their activities were "so closely related to […] commerce as to be in practice and in legal contemplation a part of it.")); *Immediato v. Postmates, Inc.*, 54 F.4th 67, 77 (1st Cir. 2022) (applying exemption and reasoning the "work, though, must be a constituent part of that [interstate] movement, as opposed to a part of an independent and contingent intrastate transaction.") (citation omitted); *Brock v. Flowers Food, Inc.*, 673 F. Supp. 3d 1180, 1185-89 (D. Colo. 2023).

Though Plaintiffs each physically moved a countless amount of goods in interstate commerce working for Defendants, such literal movement of goods is not required when, as here, Plaintiffs' essential responsibilities include controlling the movement or non-movement of what cargo gets onto the airplanes, as well as how it gets there. *See Lopez*, 2022 WL 18232726, at *3 (holding that while the "employee who adds fuel to cargo planes is not literally moving goods (as the plaintiffs in *Saxon* and *Rittman* did), he is closer both physically and temporally to the actual movement of goods between states than a truck mechanic who works on trucks that move goods in interstate commerce …"). Given that Plaintiffs belong to a class of workers who physically move goods to the very edge of the airplanes along the jet bridge, and physically move baggage to the conveyor belts, flat beds, and outside drop locations that result in their being loaded onto the airplanes, Plaintiffs need not rely on *Lopez* and the fact that they were closer both physically and temporally to the actual movement of goods as the plaintiff in that case. *See* Pltfs' Appx., pp. 2-7 - Ex. B, Joyner Decl.; pp. 12-15 - Ex. C, Dixon Decl.; pp. 17-20 - Ex. D, Hobley Decl. However,

the *Lopez* courts' reasoning applies to exempt Plaintiffs because they were "so closely related to interstate transportation as to be practically a part of it." *Lopez*, 2022 WL 18232726, at *3.

Plaintiffs' frequent and direct role in the transportation of cargo across interstate borders is easily contrasted with cases in which courts have found § 1's exemption does not apply. *Cf. Stain v. TransCanada USA Servs., Inc.*, No. CV H-22-2921, 2023 WL 417476, at *4 (S.D. Tex. Jan. 25, 2023 (non-exempt pipe worker "inspects the physical infrastructure needed for the interstate transportation of oil and gas, he does not handle, control, direct, or otherwise directly engage with the flow of those products and therefore is not an exempt transportation worker."); *Fli-Lo Falcon, LLC v. Amazon.com Inc.*, No. C22-441-MLP, 2022 WL 4451273, at *6 (W.D. Wash. Sept. 8, 2022) (exemption does not apply to "commercial agreement between business entities for the delivery of goods."); *Archer v. Grubhub, Inc.*, 490 Mass. 352, 360 (2022) (distinguishing non-exempt Grubhub drivers from exempt workers whose work "was a part of the ongoing and continuous nature of the interstate transit of the good to the customer.").

Furthermore, Defendants present evidence regarding what they claim gate and ticketing CSAs are supposedly *directed* to do or *discouraged* from doing, which, setting aside that these facts are not true for the moment, is a far cry from what gate and ticketing CSAs actually do. *See* Defs'. Mtn., pp. 6, 15. Plaintiffs' actual job functions presented in their affidavits submitted herewith, and as depicted in Defendants' own job descriptions, show the direct and frequent link Plaintiffs play in moving and transporting goods. *See* Pltfs'. Appx., pp. 2-7 - Ex. B, Joyner Decl.; pp. 9-11, Exs. B1-B3, January 2023 Videos 1-3; pp. 12-15 - Ex. C, Dixon Decl.; pp. 17-20 - Ex. D, Hobley Decl. *Saxon* does not mandate that Plaintiffs' sole duties concern the transportation of goods; instead, the employee in *Saxon* trained other employees as part of her duties, but she also

physically unloaded cargo "on a frequent basis" when filling in as a ramp agent up to a maximum of three shifts per week. 596 U.S. at 456.

Plaintiffs worked extremely long and, often, consecutive shifts without legally mandated breaks, the majority of time which was or is often devoted to physically picking up, loading, re-positioning, receiving, and carrying cargo to and from the airplanes, as well as reuniting cargo being unloaded from the plane with passengers. Handling the smooth transition of cargo to and from the airplanes is a core component of Plaintiffs' jobs, and this Court can hardly be pressed to believe that Defendants and Frontier encourage or allow the passenger free-for-all depicted by Defendants where ticketing and gate CSAs are supposedly directed to merely passively watch passengers' exclusive handling and control of their own cargo to and from the airplanes. After all, Frontier logically contracts with the Menzies Defendants to ensure such passive practices do not occur and interrupt the careful transportation of passenger cargo.

The Supreme Court's analysis of the link required to be found to have engage in interstate commerce in the context of the Sherman Act is also instructive on why Plaintiffs, even in just simply controlling, let alone physically handling goods, constitutes direct engagement in transportation of goods across interstate borders. *See United States v. Yellow Cab Co.*, 332 U.S. 218, 228-29 (1947), overruled on other grounds by *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984). Essentially, if a train passenger departs the train and has a taxi arranged by the train company waiting to take the passenger to a different location, the tax ride is a part of interstate commerce. *Id.* In contrast, if a train passenger departs the train and independently solicits any taxi waiting outside of the station, the train ride is not a part of interstate commerce. *Id.*

> The transportation of such passengers and their luggage between stations in Chicago is clearly a part of the stream of interstate commerce. When persons or goods move from a point of origin in one state to a point of destination in another, the fact that a part of that journey consists of

11

> transportation by an independent agency solely within the boundaries of one state does not make that portion of the trip any less interstate in character. That portion must be viewed in its relation to the entire journey rather than in isolation. So viewed, it is an integral step in the interstate movement.
>
> …
>
> In a sense, of course, a traveler starts an interstate journey when [they board] a conveyance near [their] home, office or hotel to travel to the railroad station, from which the journey is continued by train; and such a journey ends when [they alight] from a conveyance near the home, office or hotel which constitutes [their] ultimate destination. Indeed, the terminal points of an interstate journey may be traced even further to the moment when the traveler leaves or enters [their] room or office and descends or ascends the building by elevator.
>
> But interstate commerce is an intensely practical concept drawn from the normal and accepted course of business. And interstate journeys are to be measured by 'the commonly accepted sense of the transportation concept.' Moreover, what may fairly be said to be the limits of an interstate shipment of goods and chattels may not necessarily be the commonly accepted limits of an individual's interstate journey. We must accordingly mark the beginning and end of a particular kind of interstate commerce by its own practical considerations.
>
> Here we believe that the common understanding is that a traveler intending to make an interstate rail journey begins his interstate movement when he boards the train at the station and that his journey ends when he disembarks at the station in the city of destination. What happens prior or subsequent to that rail journey, at least in the absence of some special arrangement, is not a constituent part of the interstate movement. The traveler has complete freedom to arrive at or leave the station by taxicab, trolley, bus, subway, elevated train, private automobile, his own two legs, or various other means of conveyance. Taxicab service is thus but one of many that may be used. It is contracted for independently of the railroad journey and may be utilized whenever the traveler so desires. From the standpoints of time and continuity, the taxicab trip may be quite distinct and separate from the interstate journey. To the taxicab driver, it is just another local fare.

*See id.* at 228-29, 231-32 (citations omitted).

Based on the practical considerations of interstate travel contemplated by the Court in *Yellow Cab Co.*, the control Defendants require Plaintiffs to take over passenger cargo traveling domestically and internationally, even if at least partly for purposes of charging extra fees and

12

properly documenting special items moving in transit, shows Plaintiffs are necessarily and frequently part of the cog in the machine moving goods out-of-state. *See* Pltfs'. Appx., pp. 2-7 - Ex. B, Joyner Decl.; pp. 12-15 - Ex. C, Dixon Decl.; pp. 17-20 - Ex. D, Hobley Decl. In addition, passengers have no actual freedom to sidestep Plaintiffs and prevent them from controlling or moving all goods that travel by air; there is no independent ability for passengers to get cargo on airplanes other than by allowing Plaintiffs to control, inspect, handle, haul or carry, lift, and load cargo to get it to the final, out-of-state destination. *See id.* The cargo begins its interstate travel when it arrives at the ticketing counters to get inspected, handled, and checked for loading, and it ends its interstate travel when it gets reunited with passengers at their final destinations, which is sometimes DIA. Cargo could not make it through that interstate stream but for Plaintiffs' work.

That is exactly the "direct and necessary role" in the free flow of goods across state lines the Court found in *Saxon*. 596 U.S. at 458-60. Plaintiffs use their hands to pick up and move cargo destined for other states and countries. *See* Pltfs'. Appx., pp. 2-7 - Ex. B, Joyner Decl.; pp. 12-15 - Ex. C, Dixon Decl.; pp. 17-20 - Ex. D, Hobley Decl. Absent Plaintiffs (or other CSAs) both physically moving cargo and verbally instructing passengers, the cargo remains at DIA and does not board. Absent Plaintiffs (or other CSAs), Defendants themselves would likely not engage in interstate commerce for very much longer. Or, applying practical considerations of air travel, Defendants would at least have a lot of complaints on their hands about why cargo never made it to the final destinations. *Cf. Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 823 F.2d 466, 473 (11th Cir. 1987) (explaining postal workers "are responsible for dozens, if not hundreds, of items of mail moving in 'interstate commerce' on a daily basis. Indeed, without them, 'interstate commerce,' as we know it today, would scarcely be possible.").

### B.     The Court Should Allow Discovery Before Concluding the FAA Applies.

If the Court is unpersuaded that Plaintiffs belong to a class of workers directly and frequently engaged in interstate commerce, Plaintiffs seek an order allowing limited discovery applying *Saxon*'s established legal framework: (1) to which class of workers did Plaintiffs belong, and (2) was the class of workers engaged in foreign or interstate commerce? 596 U.S. at 455-56; *Brock*, 673 F. Supp. 3d at 1185-89. The district court in *Saxon* allowed this type of discovery. *Saxon v. Sw. Airlines Co.*, No. 19-CV-0403, 2019 WL 4958247, at *2 (N.D. Ill. Oct. 8, 2019).

### C.     Colorado Law Voids the Arbitration Agreements.

When the FAA does not apply, "courts look to state law to decide whether arbitration should be compelled nonetheless." *Breazeale v. Victim Servs., Inc.*, 198 F. Supp. 3d 1070, 1079 (N.D. Cal. 2016) (citation omitted); *see also Pope v. Integrated Assocs. of Denver, Inc.*, No. 16-CV-2588-JLK, 2017 WL 4857407, at *3 (D. Colo. Apr. 21, 2017) (applying Colorado Wage Act to void arbitration agreement not subject to FAA). Plaintiffs assert claims under the CWA and the Colorado Minimum Wages of Workers Act ("CMWA"). *See* ECF No. 21, ¶¶ 87-131. Both laws give aggrieved employees the right to file a lawsuit in court. C.R.S. § 8-13.3-411(4)(a) ("A person aggrieved by a violation of this part 4 may commence a civil action in district court no later than two years after the violation occurs."); C.R.S. § 8-6-118 ("An employee receiving less than the legal minimum wage applicable to such employee is entitled to recover in a civil action the unpaid balance of the full amount of such minimum wage, together with reasonable attorney fees and court costs, …"); *see also* 7 CCR 1103-1, Rule 8.1(A).

The CWA also expressly provides for class litigation. C.R.S. § 8-4-109(3)(a) ("[T]he employee [or] the employee's designated agent … may send a written demand for the payment on behalf of the employee or a group of similarly situated employees or may file an administrative

14

claim or civil action for the payment."); C.R.S. § 8-4-109(3)(b) ("[T]he employer is liable to the employee or group of similarly situated employees."). The CWA also voids any "agreement, written or oral, by any employee purporting to waive or to modify such employee's rights in violation of" the CWA. C.R.S. § 8-4-121. The Colorado Supreme Court held that this provision means that an arbitration agreement:

> that conflicts with the rights established by the Wage Claim Act cannot be enforced against the employee. The General Assembly has developed a comprehensive statutory scheme through which employees may obtain wages that are owed. The plain language of the statute establishes that the General Assembly intended Colorado employees to be able to recover past due wages by filing a civil action in the Colorado courts. Section 8–4–125 implements this policy by protecting employees against contractual waiver or modification of these substantive and procedural rights. Therefore, by the terms of section 8–4–125, an arbitration provision that waives an employee's rights under the Wage Claim Act is void.

*Lambdin v. Dist. Ct. In & For 18th Jud. Dist. of Cnty. of Arapahoe,* 903 P.2d 1126, 1130 (Colo. 1995); *see also Pope,* 2017 WL 4857407, at *3 ("Because the Colorado Wage Claim Act guarantees a right to a trial, Plaintiff's wage claim is exempt from arbitration.").

The arbitration agreements purport to waive Plaintiffs' rights to bring a class wage theft claim in court. These rights are guaranteed by Colorado statute, and the CWA's anti-waiver provision means the arbitration agreements are void. Since the FAA does not apply to Plaintiffs, it cannot preempt the anti-waiver provision of the CWA.

## V.     CONCLUSION.

Given that Plaintiffs play a direct, frequent, and necessary role in interstate commerce as transportation workers, the FAA exempts them from its coverage. Colorado law voids their arbitration agreements because they purport to waive Plaintiffs' rights to bring class action claims in court. The Court should therefore deny Defendants' Motion.

Dated: September 6, 2024.

**HKM Employment Attorneys, LLP**

By: */s/ Shelby Woods*
Shelby Woods, #48606
Abby Zinman #57792
518 17th Street, Suite 1100
Denver, CO 80202
Tele: (720) 410-8372
swoods@hkm.com
azinman@hkm.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this day, September 6, 2024, a true and correct copy of the foregoing **PLAINTIFFS' RESPONSE TO THE MENZIES DEFENDANTS' MOTION TO COMPEL ARBITRATION** was served on the following:

Michael F. Ryan
Foley & Lardner, LLP
1400 16th Street, Suite 200
Denver, Colorado 80202
(720) 437-2000
(720) 437-2200
mryan@foley.com
*Attorneys for Defendants Simplicity Ground Services LLC,*
*d/b/a Menzies Aviation; and Aircraft Service International,*
*Inc., d/b/a Menzies Aviation*

Jennifer S. Harpole
Carolyn B. Theis
Littler Mendelson, P.C.
1900 Sixteenth Street, Suite 800
Denver, CO 80202
Phone: 303.629.6200
Fax: 303.629.0200
jharpole@littler.com
catheis@littler.com
*Attorneys for Defendant Frontier Airlines, Inc.*

*/s/ Tammy Harris*
Tammy Harris

16