IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-1672-SKC-KAS

CHIQUITA JOYNER,
HELEN DIXON, and
TAJAHNE HOBLEY, on behalf of themselves and all others similarly situated,

    Plaintiffs,

v.

FRONTIER AIRLINES, INC., a Colorado corporation;
SIMPLICITY GROUND SERVICES LLC, d/b/a MENZIES AVIATION, a Delaware limited liability company; and
AIRCRAFT SERVICE INTERNATIONAL, INC., d/b/a MENZIES AVIATION, a Delaware corporation,

    Defendants.

**PLAINTIFFS' RESPONSE TO DEFENDANT FRONTIER AIRLINES INC.'S MOTION TO COMPEL ARBITRATION AND DISMISS, ADMINISTRATIVELY CLOSE, OR STAY THIS ACTION**

Plaintiffs, Chiquita Joyner, Helen Dixon, and Tajahne Hobley, on behalf of themselves and all others similarly situated ("Plaintiffs"), hereby file their Response to Defendant Frontier Airlines Inc.'s Motion to Compel Arbitration and Dismiss, Administratively Close, or Stay this Action, filed September 3, 2024, ECF No. 33 (Defendant's "Motion").

### I.    INTRODUCTION

The Federal Arbitration Act ("FAA") does not apply because Plaintiffs have presented sufficient evidence that they fit within the exemption for "transportation workers" who frequently play a direct and necessary role in the movement of cargo across interstate channels. In contrast, Frontier Airlines Inc. ("Defendant" or "Frontier") does not directly present any evidence of what Plaintiffs' daily roles were working at Frontier's ticketing and gate counters, instead relying

exclusively on Simplicity Ground Services LLC and Aircraft Service International, Inc.'s (collectively, the "Menzies' Defendants") claim that their ticketing and gate workers supposedly play an almost purely passive role 99% of the time in watching passengers exclusively control and handle their own cargo to get it on Frontier airplanes. While practical logic suggests that scenario supposedly happening 99% of the time for each of Frontier's DIA flights is unlikely, Plaintiffs' job descriptions completely refute Defendants' claims about Plaintiffs' actual job requirements, given that Plaintiffs are expressly required to "***frequently lift and/or move up to 25 lbs.*** and occasionally lift and/or move up to 70 pounds" as part of their essential job duties. ECF 27-1, at pp. 16, 19, 22 (emphasis added). What exactly are Plaintiffs required to frequently lift and/or move, if not cargo bound for an interstate destination? *See also* Pltfs'. Appx., p. 1, Ex. A.

Frontier has thus failed to show Plaintiffs fall within the FAA's coverage. As a result, the Court need not decide whether Frontier could have otherwise been able to force Plaintiffs to arbitration as a non-signatory of the agreements. Whether the arbitration agreements include a delegation clause is also irrelevant to the Court's decision, since the agreements are unenforceable as to Plaintiffs. When the FAA does not apply, the FAA cannot preempt the state law that governs in its stead. The Colorado Wage Act ("CWA") voids agreements that purport to waive rights under the statute, including arbitration agreements that waive the right to bring CWA claims in court. As a result, because Frontier cannot show enforceable arbitration agreements exist to which the FAA applies, Defendant's Motion should be denied.

II.     **STANDARD OF REVIEW.**

Typically, "the party moving to compel arbitration bears the initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable agreement." *Bellman v. i3Carbon, LLC*, 563 Fed. App'x 608, 612 (10th Cir. 2014). Because the FAA's coverage determines

2

if an enforceable agreement exists, Defendant must prove Plaintiffs are not exempt from the FAA because whether Plaintiffs fall into the exemption of § 1 of the FAA determines if the arbitration agreements exist such that the second analysis of whether they are void under Colorado law is warranted. Because the burden of proving the existence of an arbitration agreement is on the party moving to compel, it is Defendant's burden to prove the agreements are covered by the FAA.

When the parties dispute the existence of an enforceable arbitration agreement, "[t]his district approaches disputes over whether the parties have agreed to arbitrate by applying 'a standard similar to that governing motions for summary judgment.'" *Clowdis v. Colorado Hi-Tec Moving & Storage, Inc.*, 11-CV-00036-CMAKMT, 2011 WL 5882191, at *4 (D. Colo. Nov. 3, 2011) (citations omitted); *see also Bellman*, 563 F. App'x at 612 (describing standard to determine whether a dispute is subject to arbitration as "similar to summary judgment practice.") (quoting *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1261 (10th Cir. 2012)). "Under this approach, [Frontier] bears the initial burden of presenting evidence sufficient to demonstrate that an enforceable arbitration agreement exist[s]." *Clowdis*, 2011 WL 5882191, at *4.

If sufficient evidence of an *enforceable* agreement is presented by the moving party, the burden then shifts to Plaintiffs to raise a genuine dispute of material fact regarding the existence of an enforceable agreement. *Papenek v. Dish Network, L.L.C.*, No. 23-184-JWB, 2024 WL 1828176, at *1 (D. Kan. July 2, 2004). If there is a dispute of material fact, a trial or evidentiary hearing is warranted. *Id.* at *2. "Only when it's clear no material disputes of fact exist and only legal questions remain" may a court resolve the arbitration question by ruling on a motion to compel, rather than conducting a summary trial." *Bellman*, 563 F. App'x at 612 (quoting *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 984 (10th Cir. 2014)).

III. **PLAINTIFFS' TRANSPORTATION WORK.**

3

Plaintiffs each, with their own hands, transported cargo along Defendant's conveyor belts, outside drops, and jet bridges to the airplanes either every shift, or at least more than 50% of the time while working. *See* Pltfs'. Appx., pp. 2-7 - Ex. B, Joyner Decl., ¶¶ 3-11; pp. 12-15 - Ex. C, Dixon Decl., ¶¶ 3-8; pp. 17-20 - Ex. D, Hobley Decl., ¶¶ 3-8. Ms. Joyner was employed as a ticketing Customer Service Agent ("CSA") between July 25, 2022 through August 24, 2023; and Ms. Dixon currently works as a ticketing CSA, a position she has worked in since around October 10, 2022. *Id.* at p. 2 - Ex. B, Joyner Decl.; p. 12 - Ex. C, Dixon Decl. Ms. Hobley worked as a gate CSA between July 25, 2022 through December 31, 2023. *Id.* at p. 17 - Ex. D, Hobley Decl.

Ticketing CSAs such as Ms. Joyner and Ms. Dixon are the first step in cargo getting from point A, the ticketing counters, to point B, the Frontier airplanes. *Id.* at pp. 2-7 - Ex. B, Joyner Decl.; pp. 12-15 - Ex. C, Dixon Decl. They physically handle and tag cargo, lift it onto conveyor belts and onto scales, reposition it on the belts, carry and haul it onto flat beds designated for certain cargo, and carry it to outside drops to get it loaded onto planes. *Id.* Even on the infrequent occasions when Ms. Joyner and Ms. Dixon have not placed their hands physically on a particular passenger's cargo at the ticketing area, they are responsible for controlling how, what, and whether cargo gets past ticketing, often sorting and inspecting cargo and otherwise controlling it through verbal instructions to passengers, without which the cargo would not be allowed to be transported from point A to point B, let alone its final destination. *Id.* In other words, if ticketing CSAs did not exist, cargo going through DIA would not make it onto the airplane or through interstate channels.

The job description for CSAs requires that Plaintiffs are "responsible for … checking baggage[.] ECF 27-1, pp. 15, 18, 21 – Ex. F, Job Descriptions. Plaintiffs' "Key Responsibilities" included "[i]nterpret[ing] identification labels along with baggage and cargo routing tags[,]" "[h]ost[ing] self-service kiosks[,]" and being "[c]omfortable lifting/moving up to 70 lbs. of cargo

4

and baggage[.]" *Id.* With respect to lifting/moving cargo, the job descriptions emphasize that the "physical demands here are representative of those that must be met by an employee to successfully perform the essential functions of this job." *Id.* "Other tasks include lifting passenger bags up to 70 lbs. which could also involve bending and stooping***. The employee must frequently lift and/or move up to 25 lbs.*** and occasionally lift and/or move up to 70 pounds." *Id.* at pp. 16, 19, 22 (emphasis added). Plaintiffs were required to and did frequently lift and/or move cargo to transport it from point A to point B, even physically taking cargo along the entire jet bridge (i.e., the walkway from the gate to the plane). *See* Pltfs'. Appx., pp. 17-20 - Ex. D, Hobley Decl.

Gate CSAs physically transport cargo from the gate to the airplane every shift they work. *Id.* Frontier even requires gate CSAs to confront passengers to meet a quota of three checked items of cargo per flight, which they do by controlling what cargo can pass to the airplane, how it can be transported to and on the airplane, what tags are required for cargo, and what fees are required for cargo to reach the airplane. *Id.* After doing all that, gate CSAs physically carry or walk the cargo down the jet bridge to drop it off at the airplane. *Id.* It is the same every flight and every shift. *Id.* Plaintiffs therefore directly and frequently carry out the final, intrastate, legs of the broader interstate journey to fall within the exemption for transportation workers.

IV. **LEGAL ARGUMENT.**

A. **The FAA Exempts Plaintiffs Because They Frequently Form a Direct Link in the Transportation of Cargo Across Interstate Borders.**

While Frontier has not directly presented any evidence that Plaintiffs fall within the coverage of the FAA, Plaintiffs' declarations, particularly in the context of the absurdity of Defendant's claim that ticketing and gate agents only passively allow passenger prerogatives to dictate the movement of cargo to and from Frontier airplanes at DIA, can lead to only one

5

reasonable conclusion: Plaintiffs frequently engaged with the channels of interstate commerce or directly affected cargo moving in interstate commerce such that § 1's exemption applies.

Section 1 of the FAA denotes that "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce" are exempt from FAA coverage. 9 U.S.C. § 1; *Int'l Bhd. of Elec. Workers, Lc. #111 v. Pub. Serv. Co. of Colo.*, 773 F.3d 1100, 1106 (10th Cir. 2014). "[T]he existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked" and the party attempting to compel arbitration bears the burden of "demonstrating a valid arbitration agreement" exists. *Fundamental Admin Servs., LLC v. Patton*, 504 F. App'x 694, 698 (10th Cir. 2012) (citations omitted). "A court should decide for itself whether § 1's "contracts of employment" exclusion applies before ordering arbitration." *New Prime Inc. v. Oliveira*, 586 U.S. 105, 109-110 (2019).

In *Southwest Airlines Co. v. Saxon*, the Supreme Court held that the loading and unloading of passenger cargo was part of the interstate transportation of that cargo. 596 U.S. 450, 455 (2022). To fall within this FAA exemption, a worker "must play a direct and 'necessary role in the free flow of goods' across borders." *Id.* at 451 (quoting *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 121 (2001)). To be a transportation worker, "an employee's relationship to the movement of goods must be sufficiently close enough to conclude that his work plays a tangible and meaningful role in their progress through the channels of interstate commerce." *Ortiz v. Randstad Inhouse Servs., Ltd. Liab. Co.*, 95 F.4th 1152, 1160 (9th Cir. 2024). However, workers "who frequently perform transportation work do not have their transportation-worker status revoked merely because they also have other responsibilities." *Canales v. CK Sales Co., LLC*, 67 F.4th 38, 45 (1st Cir. 2023).

Plaintiffs fall within a "class of workers engaged in foreign or interstate commerce" because Plaintiffs are ticketing and gate CSAs who frequently receive, handle, control, and load

6

cargo, as well as reuniting passengers with their cargo at their final destinations. *See* Pltfs'. Appx., pp. 2-7 - Ex. B, Joyner Decl.; pp. 9-11 - Exs. B-1-B-3, January 2023 Videos 1-3; pp. 12-15 - Ex. C, Dixon Decl.; pp. 17-20 - Ex. D, Hobley Decl. Plaintiffs are like the airplane cargo loaders directly involved in interstate commerce in *Saxon*, because they spend a majority of their time each shift directly handling cargo, which is necessary to make sure the cargo gets from point A to point B, and they are thus "directly involved in" the transportation of goods crossing state borders. *See* 596 U.S. at 457-60; *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 910-15 (9th Cir. 2020).

While *Saxon* held the transportation-involved part of a worker's job, such as loading and unloading airplane cargo, need only be "frequent," it also explained that, if a ramp supervisor like Saxon filled in as a ramp agent *up to a maximum amount* of three shifts per week, his involvement with interstate transportation would be sufficiently frequent. *Saxon*, 596 U.S. at 456; *see also* 596 U.S. at 456, n.1 (suggesting mere supervision of cargo loading alone, without any direct handling of such cargo, could suffice to exempt a class of workers under § 1).

Thus, even workers who spend multiple entire shifts per week doing activities other than physically handling cargo are sufficiently engaged in interstate commerce for purposes of § 1's exemption. *See id.* Plaintiffs here spend 50-80% of their time directly and necessarily handling cargo. *See* Pltfs'. Appx., pp. 6-7 - Ex. B, Joyner Decl.; p. 15 -- Ex. C, Dixon Decl.; pp. 17-20 - Ex. D, Hobley Decl. This readily satisfies the "frequent" interaction requirement with goods moving in interstate channels under *Saxon*. *See id.* Focusing on these workers' roles in the flow of goods in interstate commerce, like the Court did in *Saxon*, it is clear Plaintiffs' handling, hauling, lifting, and loading of goods, as well as their control of how and whether such goods make it through interstate commerce, makes them a direct and necessary link in the chain that results in such goods

7

crossing interstate channels. *See Saxon*, 596 U.S. at 461-63; *Bissonnette v. Lepage Bakeries Park St., LLC*, 601 U.S. 246, 255-56 (2024); *Rittman*, 971 F.3d at 916-17.

Many courts have applied § 1's exemption and *Saxon* to workers like Plaintiffs who form a constituent part of the movement of goods across interstate borders. *See, e.g., Brock v. Flowers Food, Inc.*, 673 F. Supp. 3d 1180, 1185-89 (D. Colo. 2023); *Ortiz v. Randstad Inhouse Servs., LLC*, No. ED CV 22-01399 TJH (SHKx), 2023 WL 2070833, at *4 (C.D. Cal. Jan. 18, 2023) (exempting employee who "used a pallet jack to move packages that arrived at the warehouse – that someone else might have, first, removed from a shipping container – to warehouse racks for temporary storage before the packages were shipped out to customers and retailers [and] later, moved those packages from storage to a 'drop zone' as part of the process of preparing the packages to leave the warehouse."), affirmed by *Ortiz v. Randstad Inhouse Servs., LLC*, No. 23-55147, 2024 WL 1070823 (9th Cir. Mar. 12, 2024); *Lopez v. Aircraft Serv. Int'l, Inc.*, No. CV 21-7108-DMG (EX), 2022 WL 18232726, at *3 (C.D. Cal. Jan. 18, 2023) (exempting the Menzies Defendants' plane fueling station employee). *See also Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 593 (3d Cir. 2004) (holding plaintiff, a field service supervisor for the defendant shipping company, was a transportation worker because she supervised the delivery of goods in interstate commerce).

Though Plaintiffs each physically moved a countless amount of goods in interstate commerce for Frontier's benefit, such literal, hands-on, movement of goods is not required where, as here, Plaintiffs' essential responsibilities include controlling the movement or non-movement of what cargo gets onto the airplanes, as well as how it gets there. *See Lopez*, 2022 WL 18232726, at *3 (holding that while the Menzies Defendants' "employee who adds fuel to cargo planes is not literally moving goods (as the plaintiffs in *Saxon* and *Rittman* did), he is closer both physically and temporally to the actual movement of goods between states than a truck mechanic who works on

8

trucks that move goods in interstate commerce …"). Given Plaintiffs belong to a class of workers who physically move goods to the airplanes along the jet bridge, and physically move baggage to the conveyor belts, flat beds, and outside drop locations that result in its being loaded onto the airplanes, Plaintiffs need not rely on *Lopez* and the fact that they were closer both physically and temporally to the actual movement of goods as the plaintiff in that case. *See* Pltfs' Appx., pp. 2-7 - Ex. B, Joyner Decl.; pp. 12-15 - Ex. C, Dixon Decl.; pp. 17-20 - Ex. D, Hobley Decl. However, the *Lopez* court's reasoning still applies to exempt Plaintiffs because they were "so closely related to interstate transportation as to be practically a part of it." *Lopez*, 2022 WL 18232726, at *3.

Furthermore, Frontier directly presents zero evidence regarding what gate and ticketing CSAs do at DIA, instead relying entirely on the Menzies' Defendants' claims of what gate and ticketing CSA are directed to or discouraged from doing, which is completely irrelevant given Plaintiffs' evidence of the work they in fact did perform. *See* Def.'s Mtn., p. 2-3 (citing exclusively to ECF 21, the Menzies Defendants' Motion); Pltfs'. Appx., pp. 2-7 - Ex. B, Joyner Decl.; pp. 12-15 - Ex. C, Dixon Decl.; pp. 17-20 - Ex. D, Hobley Decl.  Plaintiffs' job functions concerning the transportation of cargo, as depicted in both their declarations and their job descriptions, show the direct and frequent link Plaintiffs play in moving and transporting goods. *Id. Saxon* does not mandate that Plaintiffs' sole duties concern the transportation of goods; instead, the employee in *Saxon* trained other employees as part of her duties, but she also physically unloaded cargo "on a frequent basis" when filling in as a ramp agent up to three shifts per week. 596 U.S. at 456.

The control Frontier requires Plaintiffs to take over passenger cargo traveling domestically and internationally, even if partly for purposes of charging extra fees and documenting special items moving in transit before they can get to point B, shows Plaintiffs are necessarily and frequently part of the cog in the machine moving cargo out-of-state. *See* Pltfs'. Appx., pp. 2-7 -

9

Ex. B, Joyner Decl.; pp. 12-15 - Ex. C, Dixon Decl.; pp. 17-20 - Ex. D, Hobley Decl. Passengers have no actual freedom to sidestep Plaintiffs and prevent them from controlling or moving all passenger cargo that travels by air; there is no independent ability for passengers to get cargo on airplanes other than by allowing Plaintiffs to control, inspect, handle, haul or carry, lift, and load cargo to get it closer to its out-of-state destination. *See id.* The cargo begins its interstate travel when it arrives at the ticketing counters to get inspected, handled, and checked for loading, and it ends its interstate travel when it gets reunited with passengers at their final destinations, which is sometimes DIA. Cargo could not make it through that interstate stream but for Plaintiffs' work.

That is exactly the "direct and necessary role" in the free flow of goods across state lines the Court found in *Saxon*. 596 U.S. at 458-60. Plaintiffs use their hands to pick up and move cargo destined for other states and countries. *See* Pltfs'. Appx., pp. 2-7 - Ex. B, Joyner Decl.; pp. 12-15 - Ex. C, Dixon Decl.; pp. 17-20 - Ex. D, Hobley Decl. Absent Plaintiffs (or other CSAs) both physically moving cargo and controlling passengers' ability to do so, the cargo remains at DIA and does not board. Absent Plaintiffs (or other CSAs), Frontier would likely not engage in interstate commerce for very much longer; given that cargo would not make it to any interstate destination.

**B.     The Agreements are "Contracts of Employment" Under § 1.**

Though Frontier claims the agreements are "separate" and "standalone" from any broader employment agreement, it provides no evidence to substantiate that claim (such as the existence or non-existence of other pre-employment or other onboarding agreements), and Frontier ignores that each agreement was signed prior to Plaintiffs' respective employments, forming part of Plaintiffs' comprehensive contracts of employment. *Cf.* ECF 27-1, p. 5; *with* Pltfs'. Appx., p. 2 – Ex. B, Joyner Decl.; *cf.* ECF 27-1, p.; *with* Pltfs'. Appx., p. 12 – Ex. C, Dixon Decl.; *cf.* ECF 27-

10

1, p. 9; *with* Pltfs'. Appx., p. 17 – Ex. D, Hobley Decl. *See also* ECF 27-1, p. 2, ¶ 4 (confirming the agreements were signed by Plaintiffs "at the outset of their respective employments.").

*Harrington v. Atl. Sounding Co.*, 602 F.3d 113, 121 (2d Cir. 2010) is factually inapposite to the arbitration agreements here. In *Harrington*, the defendants employed the plaintiff for more than two years when the plaintiff was injured on the job. *Id.* at 115-16. While receiving financial support from the defendants for his injury, the plaintiff signed a "Claim Arbitration Agreement" the defendants mailed him. *Id.* The arbitration agreement stated the defendants "are prepared to make voluntary advances against settlement of any claim that could arise out of the personal injury/illness claim [the plaintiff has] made …, provided [the plaintiff] agree[d] to arbitrate any such claim." *Id.* at 116. The plaintiff agreed to arbitrate in exchange for the employer agreeing to advance 60% of gross wages as an "advance against settlement" for the plaintiff's injury. *Id.*

The *Harrington* court found the agreement to arbitrate was not a "contract of employment" for purposes of § 1 because it was completely unrelated to the plaintiff becoming employed. *Harrington* took guidance from *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991), a case where the arbitration agreement was part of a securities registration application, a situation where courts have uniformly held § 1's exemption does not apply. *See Gilmer*, 500 at 23-25, n. 2.

The pre-employment agreements here are between Plaintiffs and their employers, and Defendant should be estopped from claiming the arbitration agreements are not "contracts of employment" to which § 1's analysis would apply, given that Defendant's Motion seeks to enforce the agreements based entirely on Defendant's alleged liability as Plaintiffs' "employer" for purposes of the CWA. Def's. Mtn., pp. 7-9. Various courts have similarly held that an arbitration agreement covering employment-related disputes are considered "contracts of employment." *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 113 (2001); *CarMax Auto Superstores Cal. LLC*

11

*v. Hernandez*, 94 F. Supp. 3d 1078, 1085, 1101 (C.D. Cal. 2015); *see also Neims v. Neovia Logistics Distribution, LP*, 2023 WL 6369780, at *4 (C.D. Cal. Aug. 10 2023); *cf. Amos v. Amazon Logistics, Inc.*, 74 F.4th 591, 593, 596 (4th Cir. 2023) (holding § 1 exemption did not apply to "the binding commercial contract" of a "business deal stuck between two corporate entities," whereas the arbitration agreements between the delivery company and its drivers were "contracts of employment" that would qualify for the transportation worker exemption).

Defendant's Motion contains no legal authority that would support finding the agreements here are either unrelated to the terms of their beginning or continued employment, as in *Harrington* and *Amos*, or with a third-party with whom no employment relationship existed, as in *Gilmer*. Similarly, *Oliveira* also does not hold that standalone arbitration agreements cannot be a part of a broader contract of employment. *See generally New Prime Inc. v. Oliveira*, 586 U.S. 105 (2019). To the contrary, *Oliveira* concluded that "Congress used the term 'contracts of employment' in a broad sense to capture any contract for the performance of *work* by *workers*." *Id.* at 116.

These agreements were part of a comprehensive contract at the outset of Plaintiffs' employment regarding the "terms and conditions" of their employment relationships, and the arbitration agreements (unless an exemption applies) dictate the terms under which any employment-related dispute will be handled during or after their employment; as well as which claims are not covered, the employee's ability to participate in class or representative actions during or after their employment, and the circumstances under which an employee will not be retaliated against while their employment continues. *See* 27-1, pp. 4-9. They are therefore "contracts of employment" as contemplated by *Oliveira*. *See also Gabay v. Roadway Movers, Inc.*, 671 F. Supp. 3d 371, 381-83 (S.D.N.Y. Apr. 28, 2023); *Abram v. C.R. England, Inc.*, No. CV-20-00764 (MWF) (MRWx), 2020 WL 5077365, at *3 (C.D. Cal. Apr. 15, 2020).

In addition, as the court reasoned in *Abram*, a conclusion that the arbitration agreements here are not "contracts of employment" would be reading the § 1 exemption "in a manner that completely eviscerates its purpose[,]" contrary to *Oliveira*. 2020 WL 5077365, at *4. If the court in *Abram* had adopted the defendant's theory:

> An otherwise covered employer could circumvent section one … by simply presenting employees with a contract outlining all terms and conditions of employment, followed by a separate arbitration agreement, even if that agreement compels arbitration of employment disputes Congress could not have intended covered employers to avoid the exclusion so easily.

*Id.* The holdings of *Harrington* and *Gilmer* do not support such an expansive result, particularly when analyzed in conjunction with *Oliveira* and *Circuit City*. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 113 (2001) ("This line of reasoning proves too much, for it would make the § 1 exclusion provision superfluous."); *Rittmann*, 971 F.3d at 907-08, 919 (finding FAA § 1 exemption applied to arbitration agreement presented as separate document); *Webb v. Rejoice Delivers LLC*, No. 22-cv-07221-BLF, 2023 WL 8438577, at *7 (N.D. Cal. Dec. 5, 2023).

Lastly, if the Court is not persuaded that the pre-employment arbitration agreements are part of Plaintiffs' "contracts of employment," Plaintiffs request limited discovery regarding whether the agreements constitute part of a comprehensive contract of employment.

### C. Delegation Clauses Are Inconsequential in Unenforceable Agreements.

The question of whether an agreement delegating questions of arbitrability to an arbitrator was addressed by the Supreme Court in *New Prime, Inc. v. Oliveira*, 586 U.S. 105, 106 (2019), a case that involved determining whether § 1's exemption applied and whether the court should initially make that § 1 determination as part of the moving party's burden of showing an enforceable agreement exists. The Court held that the FAA's "terms and sequencing" bestowed courts with the authority to determine initially whether § 1's exclusions applied, and "[a] court

13

should determine whether a § 1 exclusion applies before ordering arbitration." *See id.* at 105, 109-12. Since Plaintiffs are transportation workers exempted from the FAA, the agreements themselves are unenforceable, as are the delegation clauses contained therein.

### D.     The Court Should Allow Discovery Before Concluding the FAA Applies.

If the Court is unpersuaded that Plaintiffs are transportation workers, Plaintiffs seek an order allowing limited discovery applying *Saxon*'s established legal framework: (1) to which class of workers did Plaintiffs belong, and (2) was the class of workers engaged in foreign or interstate commerce? 596 U.S. at 455-56; *Brock*, 673 F. Supp. 3d at 1185-89. The district court in *Saxon* allowed this type of discovery. *Saxon v. Sw. Airlines Co.*, No. 19-CV-0403, 2019 WL 4958247, at *2 (N.D. Ill. Oct. 8, 2019). In addition, if the Court grants Defendant's Motion, Plaintiffs request a stay pending arbitration, in lieu of dismissal. *Smith v. Spizzirri*, 601 U.S. 472 (2024) (FAA compels courts to stay proceeding pending arbitration if one party has requested a stay).

### E.     Colorado Law Voids the Arbitration Agreements.

When the FAA does not apply, "courts look to state law to decide whether arbitration should be compelled nonetheless." *Breazeale v. Victim Servs., Inc.*, 198 F. Supp. 3d 1070, 1079 (N.D. Cal. 2016) (citation omitted); *see also Pope v. Integrated Assocs. of Denver, Inc.*, No. 16-CV-2588-JLK, 2017 WL 4857407, at *3 (D. Colo. Apr. 21, 2017). Plaintiffs assert claims under the CWA and the Colorado Minimum Wages of Workers Act ("CMWA"). *See* ECF No. 21, ¶¶ 87-131. Both laws give aggrieved employees the right to file a lawsuit in court. C.R.S. § 8-13.3-411(4)(a); C.R.S. § 8-6-118; *see also* 7 CCR 1103-1, Rule 8.1(A).

The CWA also expressly provides for class litigation. C.R.S. § 8-4-109(3)(a); C.R.S. § 8-4-109(3)(b) ("[T]he employer is liable to the employee or group of similarly situated employees."). The CWA also voids any "agreement, written or oral, by any employee purporting to waive or to

modify such employee's rights in violation of" the CWA. C.R.S. § 8-4-121. The Colorado Supreme Court held that this provision means that an arbitration agreement:

> that conflicts with the rights established by the Wage Claim Act cannot be enforced against the employee. The General Assembly has developed a comprehensive statutory scheme through which employees may obtain wages that are owed. The plain language of the statute establishes that the General Assembly intended Colorado employees to be able to recover past due wages by filing a civil action in the Colorado courts. Section 8–4–125 implements this policy by protecting employees against contractual waiver or modification of these substantive and procedural rights. Therefore, by the terms of section 8–4–125, an arbitration provision that waives an employee's rights under the Wage Claim Act is void.

*Lambdin v. Dist. Ct. In & For 18th Jud. Dist. of Cnty. of Arapahoe,* 903 P.2d 1126, 1130 (Colo. 1995); *see also Pope,* 2017 WL 4857407, at *3 ("Because the Colorado Wage Claim Act guarantees a right to a trial, Plaintiff's wage claim is exempt from arbitration.").

The arbitration agreements purport to waive Plaintiffs' rights to bring a class wage theft claim in court. These rights are guaranteed by Colorado statute, and the CWA's anti-waiver provision means the arbitration agreements are void. Since the FAA does not apply to Plaintiffs, it cannot preempt the anti-waiver provision of the CWA. *See Grohn v. Sisters of Charity Health Servs. Colo.*, 960 P.3d 722, 727-28 (Colo. App. 1998) (engaging in preemption analysis concerning FAA and CWA only where court concluded FAA's § 1 exemption did not apply).

## V.  CONCLUSION.

Given that Plaintiffs play a direct, frequent, and necessary role in interstate commerce, the FAA exempts them from its coverage. And, while the pre-employment arbitration agreements satisfy the broad standard for "contracts of employment" for purposes of a § 1 determination, the delegation clauses they contain carry no weight because the agreements are unenforceable as to Plaintiffs. Colorado law voids their arbitration agreements because they purport to waive Plaintiffs' rights to bring class action claims in court. The Court should therefore deny Frontier's Motion.

Dated: September 24, 2024.

        **HKM Employment Attorneys, LLP**

        By: */s/ Shelby Woods*
        Shelby Woods
        Abby Zinman
        518 17th Street, Suite 1100
        Denver, CO 80202
        Tele: (720) 410-8372
        swoods@hkm.com
        azinman@hkm.com
        *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this day, September 24, 2024, a true and correct copy of the foregoing **PLAINTIFFS' RESPONSE TO DEFENDANT FRONTIER AIRLINES INC.'S MOTION TO COMPEL ARBITRATION AND DISMISS, ADMINISTRATIVELY CLOSE, OR STAY THIS ACTION** was served on the following:

Michael F. Ryan
Foley & Lardner, LLP
1400 16th Street, Suite 200
Denver, Colorado 80202
(720) 437-2000
(720) 437-2200
mryan@foley.com
*Attorneys for Defendants Simplicity Ground Services LLC,*
*d/b/a Menzies Aviation; and Aircraft Service International,*
*Inc., d/b/a Menzies Aviation*

Jennifer S. Harpole
Carolyn B. Theis
Littler Mendelson, P.C.
1900 Sixteenth Street, Suite 800
Denver, CO 80202
Phone: 303.629.6200
Fax: 303.629.0200
jharpole@littler.com
catheis@littler.com
*Attorneys for Defendant Frontier Airlines, Inc.*

        */s/ Tammy Harris*
        Tammy Harris