**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:24-cv-1672-SKC-KAS

CHIQUITA JOYNER,
HELEN DIXON, and
TAJAHNE HOBLEY, on behalf of themselves and all others similarly situated,

      Plaintiffs,

v.

FRONTIER AIRLINES, INC., a Colorado corporation;
SIMPLICITY GROUND SERVICES LLC, d/b/a MENZIES AVIATION, a Delaware limited
liability company; and
AIRCRAFT SERVICE INTERNATIONAL, INC., d/b/a MENZIES AVIATION, a Delaware
corporation,

      Defendants.

---

**PLAINTIFFS' APPENDIX TO PLAITNIFFS' RESPONSE TO DEFENDANT
FRONTIER AIRLINES, INC'S MOTION TO COMPEL ARBITRATION AND
DISMISS, ADMINISTRATIVELY CLOSE, OR STAY THIS ACTION**

---

**Exhibits**                                                                 **Pages**

1.    Menzies Website Screenshot (Exhibit A)……………………………………1

2.    Declaration of Chiquita Joyner (Exhibit B)………………………………2-8

3.    January 2023 Video 1 (Exhibit B-1)…………………………………………9

4.    January 2023 Video 2 (Exhibit B-2)…………………………………………10

5.    January 2023 Video 3 (Exhibit B-3)…………………………………………11

6.    Declaration of Helen Dixon (Exhibit C)………………………………....12-16

7.    Declaration of Tajahne Hobley (Exhibit D)………………………………...17-21

Exhibit A



**Exhibit B**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-01672-SKC-KAS

CHIQUITA JOYNER,
HELEN DIXON, and
TAJAHNE HOBLEY, on behalf of themselves and all others similarly situated,

      Plaintiffs,

v.

FRONTIER AIRLINES, INC., a Colorado corporation;
SIMPLICITY GROUND SERVICES LLC, d/b/a MENZIES AVIATION, a Delaware limited
liability company; and
AIRCRAFT SERVICE INTERNATIONAL, INC., d/b/a MENZIES AVIATION, a Delaware
corporation,

      Defendants.

---

## DECLARATION OF CHIQUITA JOYNER IN SUPPORT OF PLAINTIFFS' RESPONSE
## TO THE MENZIES DEFENDANTS' MOTION TO COMPEL ARBITRATION

---

I, Chiquita Joyner, declare and state as follows:

1.      I am over the age of 18 and competent to testify to the facts in this Declaration. I make this Declaration based on my personal knowledge.

2.      I am one of the Plaintiffs in this matter. Defendants Simplicity Ground Services LLC and Aircraft Service International, Inc. employed me between approximately July 25, 2022 to August 24, 2023 as a ticket counter Customer Service Agent. Throughout the time I worked for Defendants, I worked at the ticketing counters at Denver International Airport ("DIA") in Denver, Colorado.

3.      Every day I worked for Defendants, I directly received, handled, lifted, loaded, and controlled the cargo transported on the airplanes flying in and out of DIA. In fact, when I first

Doc ID: 4969704a8e6c3365a0e86f29eaa0fb4413b71519

**Exhibit B**

started working for Defendants, I had to personally haul 50-60 pound bags and other special items

onto the conveyor belts myself for each passenger, because we were located on the east side of the

terminal at one end of the airport where there were no self-service kiosks. After a few months of

this, we moved toward the middle of the airport where there were self-service kiosks. Even then,

I frequently handled passengers' cargo nearly every day in which I worked.  For example, the

following video is a true and correct copy of footage showing me telling a passenger in January

2023 that she was fine, and "we're grabbing them," referring to "them" as the backlog of baggage

and other items we were responsible for loading, handling, and controlling that day, while the

passengers continued on to their gates. *See* January 2023 Video 1, attached here as **Exhibit B-1**.

4.       I am aware that Defendants have claimed they instructed us *not* to handle

passengers' bags in our roles as ticketing CSAs, and that our direct contact with customer bags

was exceptionally infrequent, involving less than 1% of all bags passing through the check-in and

ticketing counters. That is simply not true. I do not recall ever being told not to touch, lift, handle

or maintain control of customer cargo because of any liability risk or any other reason. Even if that

instruction is hidden in some fine print that was never highlighted for me, management for

Defendants repeatedly communicated their expectation that we control and personally lift or haul

cargo for passengers, which sometimes resulted in passengers being charged more fees for

Defendants' benefit.

5.       While there is some difference in how frequently we were required to personally

lift and handle cargo based on whether we were working at the agent-assist side or the bag-drop

side, that difference in frequency was often very marginal. The agent-assist side involved cargo

passengers did not want to tag, weigh, or put on the conveyor belts themselves. Passengers paid a

$25 fee for me and other CSAs to do that for them. That means a CSA working on the agent-assist

Doc ID: 4969704a8e6c3365a0e86f29eaa0fb4413b71519

## Exhibit B

side directly tagged, handled, lifted, hauled, carried, and loaded 100% of the cargo for passengers, sometimes resulting in having to lift cargo multiple times to re-weigh it or taking it all the way outside to a ramp or cart near the airplane to ensure its smooth transportation to the correct destination. Clearly, Defendants did not mind passengers paying for our direct role in transporting the cargo without the passengers' involvement in exchange for a higher fee from passengers. CSAs such as me also liked being assigned to the agent-assist side, where we earned a modest commission based on the extra fee charged to passengers for handling their cargo. We were also expected to control the transportation of cargo by charging fees for overweight cargo and cargo destined for international flights, which we were responsible for identifying and transporting with the appropriate fees being charged per Defendants' policies.

6.     Working on the bag-drop side was theoretically supposed to involve less direct lifting and handling of cargo compared to the agent-assist side. However, when we were very busy and short-staffed (which was almost always the case), we were instructed to help customers tag and place their bags on the conveyor belts to help the transportation of the cargo to move more quickly to help resolve the backlog of bags and long passenger lines. Even when we were not busy or short-staffed (which was very infrequent), we were expected to allow passengers to leave their bags behind to catch their flights, while we were expected to be familiar with the cargos' destinations to know how to transport the cargo without the passengers even being present.

7.     For example, attached herewith is a true and correct copy of video footage of me and other ticketing CSAs working while passengers left their cargo behind to catch their flights. *See* January 2023 Video 2, attached here as **Exhibit B-2**. Though I was working on the bag-drop side on this day, where theoretically I would have been expected to directly handle, control and lift cargo less often since passengers were not paying an extra fee for that service, Defendants still

4

Doc ID: 4969704a8e6c3365a0e86f29eaa0fb4413b71519

**Exhibit B**

expected us to maintain control of cargo to ensure that it arrived at the correct airplanes and destinations, consistent with Defendants' policies related to the smooth and safe transportation of cargo. When passengers left their cargo to catch their flights, I personally, along with the other CSAs working at the time, picked up the cargo displayed in the video and took it outside to place on the conveyor belts to the correct airplanes.

8.      The above-described scenarios in which I personally had to control, lift, haul, and drop-off cargo were frequent. There were also various times when the conveyor belts broke down or became backed up when we would start manually dropping bags one-by-one onto the ramp to the airplane or the cart outside by the airplane ramp. There were at least three separate occasions during which I specifically recall that this occurred to such an extent that me and the other CSAs working hauled and loaded more than 500 items of cargo prior to clocking-out and leaving DIA. There were also countless times in which I was working the bag-drop side, but the agent-assist and bag-drop lines would become deliberately intermingled because the lines were too backed up and CSAs from the agent-assist side would get moved over to help what was the bag-drop line move more quickly by personally tagging and loading the bags onto the conveyor belts.

9.      In addition, even when I did not personally touch cargo, which was not common, I was expected by Defendants at all times to be in control of the transportation of passengers' cargo, regardless of what side I was working on. For example, when passengers had car seats, strollers, or other non-luggage items, I was responsible for unzipping or unpackaging those items to inspect that there was not any additional cargo hidden inside. We were also required to personally identify and affix tags for other special items we spotted. For example, if a passenger declared having a firearm or another dangerous object, I would tag the item personally, and the passenger would not be able to touch the item anymore before it proceeded through security. Also, even when

5

Doc ID: 4969704a8e6c3365a0e86f29eaa0fb4413b71519

**Exhibit B**

passengers tagged their own cargo and lifted their own cargo onto the conveyor belts, I was responsible for quickly repositioning the cargo in the right way so it would move smoothly down the belt without falling off or causing an obstruction. I was also expected to give passengers instructions on how to place their cargo, which still often resulted in the cargo being positioned incorrectly. I was expected to then run over and hurry to grab the cargo before it messed up the whole system for transporting all items to the correct destinations. One passenger could easily mess up the conveyor belt, causing it to shut down for all cargo before someone could come and help fix the problem to start getting cargo loaded again.

10.     Even while working at the self-service kiosks, I and other CSAs would help passengers put their cargo on the conveyor belt and give instructions on how to haul and place them together so the cargo could be transported without issue. We also often dealt with a lot of passengers who could not lift their own bags, meaning we would be expected to handle, carry, haul, and lift cargo ourselves regardless of which side we were working on. However, during my time working for Defendants, I worked the agent-assist and bag-drop sides most often, though when I worked in bag-drop I still had to perform the same job responsibilities as the agent-assist side by frequently handling, carrying, hauling, and lifting cargo myself without any chance of earning a commission for having done so. For example, attached is a true and correct copy of another CSA hauling a passenger's bag to the conveyor belt, though I was working on the bag-drop side that day. *See* January 2023 Video 3, attached hereto as **Exhibit B-3**.

11.     Based on the foregoing, I conservatively believe I ended up having to personally handle, lift, haul, and/or carry passenger cargo more than 50% of the time while working, and that frequency increased very significantly when we were short-staffed or the lines were backed up,

6

**Exhibit B**

which was often. I also was expected to and did directly and necessarily control the transportation

of passenger cargo 100% of the time while working.

      12.     I declare under penalty of perjury that the foregoing is true and correct.


Dated: 09 / 05 / 2024

                     *Chiquita Joyner*

                     Chiquita Joyner

Doc ID: 4969704a8e6c3365a0e86f29eaa0fb4413b71519

**Exhibit B**

✖ Dropbox Sign                                                          Audit trail

| | |
|---|---|
| **Title** | Chiquita Joyner - Declaration |
| **File name** | 2024.09.05_Dec_of...TC_Arb__fnl_.docx |
| **Document ID** | 4969704a8e6c3365a0e86f29eaa0fb4413b71519 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document History

⟲ SENT

**09 / 05 / 2024**
15:40:06 UTC-6

Sent for signature to Chiquita Joyner
(chiquitajoyner83@gmail.com) from legalassistant@hkm.com
IP: 73.181.30.22

👁 VIEWED

**09 / 05 / 2024**
16:38:46 UTC-6

Viewed by Chiquita Joyner (chiquitajoyner83@gmail.com)
IP: 98.43.189.191

✍ SIGNED

**09 / 05 / 2024**
17:00:53 UTC-6

Signed by Chiquita Joyner (chiquitajoyner83@gmail.com)
IP: 98.43.189.191

✓ COMPLETED

**09 / 05 / 2024**
17:00:53 UTC-6

The document has been completed.

Powered by ✖ Dropbox Sign

**Exhibit B-1 - January 2023 Video 1 Placeholder**

**(See USB Drive)**

**Exhibit B-2 - January 2023 Video 2 Placeholder**

**(See USB Drive)**

**Exhibit B-3 – January 2023 Video 3 Placeholder**

**(See USB Drive)**

**Exhibit C**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-01672-SKC-KAS

CHIQUITA JOYNER,
HELEN DIXON, and
TAJAHNE HOBLEY, on behalf of themselves and all others similarly situated,

      Plaintiffs,

v.

FRONTIER AIRLINES, INC., a Colorado corporation;
SIMPLICITY GROUND SERVICES LLC, d/b/a MENZIES AVIATION, a Delaware limited
liability company; and
AIRCRAFT SERVICE INTERNATIONAL, INC., d/b/a MENZIES AVIATION, a Delaware
corporation,

      Defendants.

---

### DECLARATION OF HELEN DIXON IN SUPPORT OF PLAINTIFFS' RESPONSE TO
### THE MENZIES DEFENDANTS' MOTION TO COMPEL ARBITRATION

---

I, Helen Dixon, declare and state as follows:

1.     I am over the age of 18 and competent to testify to the facts in this Declaration. I make this Declaration based on my personal knowledge.

2.     I am one of the Plaintiffs in this matter. I have worked for Defendants Simplicity Ground Services LLC and Aircraft Service International, Inc. since approximately October 10, 2022 as a ticket counter Customer Service Agent ("CSA"). Throughout the time I have worked for Defendants, I worked at the ticketing counters at Denver International Airport ("DIA") in Denver, Colorado.

3.     I directly receive, handle, lift, load, and control the cargo transported on the airplanes flying in and out of DIA every single day I work for Defendants, which has been the case

Doc ID: f8a8bf5c45bda338ab113ad6ae0351d4e4f86e57

**Exhibit C**

throughout my employment with them. Even when I work the bag-drop side, passengers will sometimes bring their own cargo up with tags already attached, but it is management's expectation that we put the cargo on the conveyor belts. Defendants' management has informed me that Frontier Airlines, Inc. ("Frontier") does not want passengers putting their own cargo on the conveyor belts, because it will result in the belt getting stuck a lot, and we have specific training on how to make sure the cargo does not get stuck on the belts. We do the same thing daily on the agent-assist side to ensure cargo gets transported to the correct destination without causing delays, lost cargo, or a breakdown of the whole transportation system.

4.      I am aware that Defendants have claimed they instructed us *not* to handle passengers' bags in our roles as ticketing CSAs and that our direct contact with customer bags was exceptionally infrequent, involving less than 1% of all bags passing through the check-in and ticketing counters. That is simply not true. I do not recall ever being told not to touch, lift, handle, or maintain control of customer cargo because of any liability risk or any other reason. Even if that instruction is hidden in some fine print that has never been highlighted for me, management for Defendants repeatedly communicated their expectation that we control and personally lift or haul cargo for passengers, which sometimes resulted in passengers being charged more fees for Defendants' benefit. The way that Frontier Airlines is set up, passengers often cannot get tags out of the self-service kiosks either because they cannot work the machines, or because Frontier closes the ability to check bags early so passengers then cannot do any self-service and have to go through the agent-assist side (and pay the $25 fee for us to completely handle tagging, lifting, hauling, and loading their cargo for them).

5.      On each of those occasions and for every other piece of passenger cargo, I also have to verify cargo meets requirements and control whether the cargo passes through to its destination,

Doc ID: f8a8bf5c45bda338ab113ad6ae0351d4e4f86e57

**Exhibit C**

as well as what fees, tags, and other requirements need to be met for the cargo to be transported

smoothly to the correct destination. I also personally help lift, carry, haul, reposition or otherwise

physically handle most of the passenger cargo when I work at either the bag-drop side or the agent-

assist side, though I can only earn a commission for performing these same responsibilities on the

agent-assist side.

6.      Even when I work at the lobby, or the self-service kiosk side, I often have to control

and give passengers instructions about reweighing their cargo. I also often still have to physically

haul, carry, or lift the cargo onto the conveyor belt for transportation. For special items, such as

car seats, tool boxes, ice chests or coolers, bikes, etc., I have to physically unpackage and inspect

those items to ensure no other cargo is hidden inside and personally haul those items to the

oversized area so it will be transported to the correct destination. For military bags and cargo over

65-70 pounds (which cuts off the conveyor belt), I have to personally haul cargo to two flat beds

for oversized objects. I physically receive the cargo, tag the cargo, notate what is in the cargo,

carry it from the conveyor belt area or kiosk area, and pile this cargo onto the flat beds for it to be

placed on the ramp to the airplane. This cargo, like all other cargo that passes through the ticketing

counters, would not make it to the correct destination without my direct and necessary control over

it to ensure it is transported to the correct destination compliant with Defendants' policies.

7.      Every now and then, when the conveyor belt breaks down, I have to directly and

physically handle, carry, lift, and load each piece of passenger cargo that comes through. There

have been various times when the conveyor belts broke down or became backed up when we had

to manually haul and wheel bags to an outside drop location. There were at least three separate

occasions in which I specifically recall where this occurred to such an extent that me and the other

14

**Exhibit C**

CSAs working hauled and loaded more than 500 items of cargo prior to clocking-out and leaving

DIA at the end of our shifts.

       8.     Based on the foregoing, I believe I end up having to personally handle, lift, haul,

and/or carry passenger cargo 50%-80% of the time while working, and that frequency increases

very significantly when we are short-staffed or the lines are backed up, which is not uncommon. I

also am expected to and do directly and necessarily control the transportation of all passenger

cargo 100% of the time while working, even if I do not personally touch the cargo myself.

       9.     I declare under penalty of perjury that the foregoing is true and correct.


Dated:  09 / 06 / 2024

                                                      Helen Dixon

15

Doc ID: f8a8bf5c45bda338ab113ad6ae0351d4e4f86e57

**✖ Dropbox** Sign                    **Exhibit C**                    Audit trail

| | |
|---|---|
| **Title** | Helen Dixon - Declaration |
| **File name** | 2024.09.05_Dec_of...TC_Arb__fnl_.docx |
| **Document ID** | f8a8bf5c45bda338ab113ad6ae0351d4e4f86e57 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document History

| | | |
|---|---|---|
| ⟳ SENT | **09 / 05 / 2024** 16:14:13 UTC-6 | Sent for signature to Helen Dixon (helenlmorris1968@gmail.com) from legalassistant@hkm.com IP: 73.181.30.22 |
| ⊙ VIEWED | **09 / 06 / 2024** 11:53:23 UTC-6 | Viewed by Helen Dixon (helenlmorris1968@gmail.com) IP: 75.71.7.68 |
| ⟋ SIGNED | **09 / 06 / 2024** 11:55:07 UTC-6 | Signed by Helen Dixon (helenlmorris1968@gmail.com) IP: 75.71.7.68 |
| ⊘ COMPLETED | **09 / 06 / 2024** 11:55:07 UTC-6 | The document has been completed. |

Powered by ✖ Dropbox Sign

**Exhibit D**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-1672-SKC-KAS

CHIQUITA JOYNER,
HELEN DIXON, and
TAJAHNE HOBLEY, on behalf of themselves and all others similarly situated,

      Plaintiffs,

v.

FRONTIER AIRLINES, INC., a Colorado corporation;
SIMPLICITY GROUND SERVICES LLC, d/b/a MENZIES AVIATION, a Delaware limited
liability company; and
AIRCRAFT SERVICE INTERNATIONAL, INC., d/b/a MENZIES AVIATION, a Delaware
corporation,

      Defendants.

---

## DECLARATION OF TAJAHNE HOBLEY IN SUPPORT OF PLAINTIFFS' RESPONSE
## TO THE MENZIES DEFENDANTS' MOTION TO COMPEL ARBITRATION

---

I, Tajahne Hobley, declare and state as follows:

1.      I am over the age of 18 and competent to testify to the facts in this Declaration. I make this Declaration based on my personal knowledge.

2.      I am one of the Plaintiffs in this matter. Defendants Simplicity Ground Services LLC and Aircraft Service International, Inc. employed me between approximately July 25, 2022 to December 31, 2023 as a gate Customer Service Agent ("CSA"). Throughout the time I worked for Defendants, I worked at the gates at Denver International Airport ("DIA") in Denver, Colorado.

3.      Every day I worked for Defendants, I directly received, handled, lifted, loaded, and controlled the cargo transported on the airplanes flying in and out of DIA. Put differently, I directly

Doc ID: 41b485623ccffc99aebbc6d11c2cfc4fd7562ee3

**Exhibit D**

and necessarily controlled and physically transported cargo during 100% of the shifts I worked for Defendants.

4.      I also made sure cargo was reunited with passengers at their destinations. For example, if a passenger was coming into DIA from somewhere else and they had already checked a car seat or other cargo, the passenger would have to re-check the cargo with me, and I would have to issue a new tag, put the tag on the cargo myself, and then take the cargo to the end of the jet bridge (i.e., the walkway that connects the airplane to the airport). In an average shift, I would check baggage every flight for multiple items, resulting in more than 20 checked items of cargo per average shift worked. This could include wheelchairs, strollers, car seats, or anything else.

5.      When it came to reuniting passengers with their cargo, Frontier Airlines, Inc. ("Frontier") flights were often delayed, and Frontier would impose a time limit on how quickly we needed to bring cargo to the passengers from the jet bridge so Frontier could expedite unloading of airplanes. I frequently went to the end of the jet bridge (i.e., right next to the plane itself), brought the cargo through the jet bridge, and delivered the cargo to the passengers exiting the plane to expedite unloading in the limited timeframe allowed by Frontier.

6.      I was also responsible for identifying compliance issues with cargo per Defendants' policies, and I was specifically instructed to try to increase the amount of cargo checked for each flight. If I identified an oversized bag, I controlled how the cargo was transported by telling the customer they would have to pay an extra fee to transport the bag and that they would have to check their cargo for it to fly underneath the plane. Similarly, I was responsible for identifying whether passengers had multiple personal items of cargo, and I was responsible for controlling the transportation of the additional cargo by charging the customer for another carry-on. Additionally, I frequently assisted passengers putting cargo in the metal sizer that dictated cargo size limits, and

Doc ID: 41b485623ccffc99aebbc6d11c2cfc4fd7562ee3

**Exhibit D**

if cargo went over the metal lines of the sizer, I was expected to deem it too big to be a carry-on and not let it through unless the passenger agreed to pay an extra fee and check the cargo.

      7.     Defendants' management frequently instructed me and other gate CSAs to focus on controlling passenger cargo they intended to bring on the airplane as their "personal items." Defendants' management told me that Frontier had a quota, in that they wanted us to get at least three items of cargo checked per flight (i.e., identify at least three items of cargo as too big to be a carry-on). Management held a lot of meetings focused on how to try to check passenger cargo, ways to get passenger cargo checked, and working through customer conflict to get cargo checked. Defendants' management explained to us that Frontier makes most of their money through checked baggage fees to keep tickets cheaper, so Defendants had to implement cargo rules and instruct us to try to make the fees Frontier wanted us to make by pushing customers to check bags and controlling how those items were transported between the gate and the airplane. As a result, I was instructed to charge customers to transport their cargo, even if an item barely had trouble fitting into the metal sizer, or if customers had more than one item or bag. Though car seats, strollers, and like items would not result in a charge to passengers, Defendants' management were very clear that those types of cargo could not get through to the airplane without me and other CSAs controlling how it was tagged, hauled or carried, and dropped at the end of the jet bridge next to the airplane.

      8.     The only rare times I was ever instructed by management not to physically touch cargo were immediately after a couple situations where employees were assaulted by passengers, because Defendants' management pushed us to confront passengers to control how cargo was transported from the gate to the airplane. Even then, management still made clear Defendants

19

Doc ID: 41b485623ccffc99aebbc6d11c2cfc4fd7562ee3

**Exhibit D**

wanted us to control what and how cargo got onto the airplane by physically handling it ourselves

and taking to the plane on the jet bridge.

        9.      I declare under penalty of perjury that the foregoing is true and correct.

Dated:   09 / 06 / 2024

_____

                         Tajahne Hobley

Doc ID: 41b485623ccffc99aebbc6d11c2cfc4fd7562ee3

Case No. 1:24-cv-01672-SKC-TPO    Document 51-1    filed 09/24/24    USDC Colorado
pg 22 of 22

# Dropbox Sign

**Exhibit D**                                              Audit trail

| | |
|---|---|
| **Title** | Tajahne Hobley - Declaration |
| **File name** | 2024.09.05_Dec_of...TC_Arb__fnl_.docx |
| **Document ID** | 41b485623ccffc99aebbc6d11c2cfc4fd7562ee3 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document History

**SENT**    **09 / 05 / 2024**    Sent for signature to Tajahne Hobley (tajahne1@gmail.com)
16:55:37 UTC-6    from legalassistant@hkm.com
IP: 73.181.30.22

**VIEWED**    **09 / 06 / 2024**    Viewed by Tajahne Hobley (tajahne1@gmail.com)
13:00:59 UTC-6    IP: 174.201.19.53

**SIGNED**    **09 / 06 / 2024**    Signed by Tajahne Hobley (tajahne1@gmail.com)
13:12:27 UTC-6    IP: 97.139.241.54

**COMPLETED**    **09 / 06 / 2024**    The document has been completed.
13:12:27 UTC-6

Powered by Dropbox Sign