IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Gordon P. Gallagher

Civil Action No. 23-cv-00477-GPG-NRN

BRANDON RIETHEIMER
and those similarly situated,

    Plaintiff,

v.

UNITED PARCEL SERVICE, INC.,

    Defendant.

## ORDER

Before the Court is the Renewed Motion to Compel Individual Arbitration of Plaintiff's First and Second Claims, Dismiss Plaintiff's Putative Class Claims and Stay This Action (Motion to Compel) (D. 38) and Renewed Motion to Dismiss Plaintiff's Third Claim for Relief Pursuant to Fed. R. Civ. P. 12(b)(6) (Motion to Dismiss) (D. 39) filed by Defendant United Parcel Service, Inc. (UPS). For the reasons set forth below, the Court DENIES the Motion to Compel and GRANTS the Motion to Dismiss.

### I. PROCEDURAL BACKGROUND

Plaintiff Brandon Rietheimer filed this putative class action in Colorado state court in January 2023, which was removed to this Court on February 21, 2023 (D. 1). Plaintiff alleges that UPS did not provide paid sick leave and underpaid full-time employees (D. 7). In his first claim, Plaintiff alleges a violation of the Colorado Healthy Families and Workplaces Act (HFWA), Colorado Revised Statute § 8-13.3-401 et seq. (*id*. at 12). His second claim is brought under the

1

Colorado Wage Act, Colorado Revised Statute § 8-4-101 et seq. (*id*. at 12–13). The third claim alleges that UPS "agreed" to pay "eight hours of straight-time pay for each day worked, regardless of actual hours worked" but did not do so in violation of the Wage Act (*id*. at 13). Plaintiff defines the classes in the case as:

> **HFWA Class:** Residents of Colorado who were employed with Defendant UPS under the Central Region CBA and worked in interstate commerce and were not provided paid sick leave in 2021, 2022, and 2023.
>
> **Full-Time Class:** Residents of Colorado who were employed with Defendant UPS since September 1, 2022, as RPCDs or 22.4 Combination Drivers as defined by Article 22 of the CBA.

(*id*. at 8). Defendant filed previous motions seeking to compel Plaintiff to individual arbitration and dismiss all the class claims (*see* D. 13, D. 14). The Court denied these motions without prejudice and allowed Plaintiff to take limited discovery on (1) which class of workers Plaintiff belonged to and (2) whether that class of workers engaged in foreign or interstate commerce (D. 30). Following this limited discovery, UPS has renewed its motions.

## II. FACTS

UPS is a logistics company primarily in the business of transporting packages.[1] Plaintiff drives a local UPS delivery truck. Plaintiff began employment with UPS as a 22.4 Combination Driver in October 2020 at the Commerce City, Colorado UPS facility, and he has been assigned to the Glendale Package Center (D. 38-1 at 38–39, Rietheimer Depo., 20:22-25, 22:3-25). His position is subject to a collective bargaining agreement (CBA). In 2023, the 22.4 Combination position was eliminated under the new CBA, and Plaintiff transferred to a Regular Package Car

---

[1] The Court draws the operative facts as set forth in the First Amended Complaint (Complaint) (D. 7) unless otherwise indicated.

2

Driver (RPCD) position (*id*. at 41–42, Rietheimer Depo., 26:22-27:19; *id*. at 20 – Messer Depo, 51:12-16).  In both positions, Plaintiff's job duties remained essentially the same (*id*. at 42 - Rietheimer Depo., 27:5-10; *id*. at 73-74 - UPS Depo., 14:16-15:6).

Plaintiff spends most of his workday in and out of his truck delivering packages and interacting with customers (D. 38-1 at 51-52 - Rietheimer Depo., 60:23-61:3).  Plaintiff can work anywhere from 5 to 14 hours per day (*id*. at 46 - Rietheimer Depo., 46:20-24), of which Plaintiff only spends 20 to 30 minutes at the UPS facility.[2]  UPS employs workers called "pre-loaders" to load Plaintiff's vehicle (*id*. at 41 - Rietheimer Depo., 26:3-10; *id*. at 25 - Messer Depo., 56:5-13) and other workers to unload most of the packages he picks up (*id*. at 54-55 - Rietheimer Depo., 63:17-19, 64:3-8).  A "package driver or RPCD or 22.4 is the last mile delivery person" (D. 44-1 at 59 - Messer Depo. 37:7–13).

Plaintiff delivers packages to customers mostly in the Denver metro area (D. 38-1 at 45 - Rietheimer Depo., 39:6-8).  His employment-related activities have taken place entirely within the State of Colorado, and he does not deliver packages outside Colorado or otherwise transport packages across state lines (*id*. at 9 – Requests for Admission (RFA) No. 1, 2; *id*. at 23–24 - Messer Depo, 54:6-25, 55:16-19; *id*. at 56 - Rietheimer Depo., 77:15-18).  He does not load packages onto or unload packages from planes or vehicles headed out of state (*id*. at 10 - RFA Nos. 6-7).  Instead, Plaintiff's role is 5 to 17 employees removed from the UPS employee who transports packages

---

[2] At the start of the workday, Plaintiff spends around 15 minutes in a meeting, inspecting his vehicle, and exiting the facility (D. 38-1 at 49-52 - Rietheimer Depo., 57:5- 58:24, 60:1-9, 61:16-24).  At the end of the workday, Plaintiff spends between 5 and 15 minutes arriving at the facility, driving to the yard, stopping at the air dock, parking, and doing a post-trip vehicle inspection (*id*. at 53–54, 58–59 - Rietheimer Depo., 62:15–63:19, 82:24–83:5).

3

across state lines (*id*. at 79-84 – UPS Depo., 77:21–82:22). Nevertheless, approximately 66% of Plaintiff's deliveries on a sample of dates were packages from out of state (D. 44-1 at 82–98).

### III. LEGAL STANDARDS

The Federal Arbitration Act (FAA) governs arbitrability questions. *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1279 (10th Cir. 2017). The FAA provides that a written arbitration agreement "evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . ." 9 U.S.C. § 2. The FAA expressly permits a party to petition a federal district court to compel arbitration. Section 4 of the FAA authorizes "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to] petition any United States district court ... for an order directing that such arbitration proceed . . . ." 9 U.S.C. § 4. "By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

"[T]he existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked" and the party attempting to compel arbitration bears the burden of "demonstrating a valid arbitration agreement" exists. *Fundamental Admin. Servs., LLC v. Patton*, 504 F. App'x 694, 698 (10th Cir. 2012) (citations omitted). To determine whether there is a valid arbitration agreement, courts employ a two-step process. The first step requires a court to determine whether there is an agreement that provides the moving party the right to compel arbitration. *Cavlovic v. J.C. Penney Corp., Inc.*, 884 F.3d 1051, 1057 (10th Cir. 2018). If the

4

movant satisfies the first step, the second step requires a court to determine whether the allegations in the complaint are within the scope of the arbitration provision. *Id*. In deciding a motion to compel arbitration, the Court applies a framework similar to that it would apply on a motion for summary judgment—a motion to compel arbitration should only be granted "if there are no genuine issues of material fact regarding the parties' agreement" to arbitrate and the Court must "give to the opposing party the benefit of all reasonable doubts and inferences that may arise." *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1261 (10th Cir. 2012) (quotations omitted).

There are exceptions to the requirement to order arbitration even where an otherwise enforceable arbitration agreement exists. Relevant here, § 1 of the FAA denotes that "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce" are exempt from FAA coverage. 9 U.S.C. § 1. The party opposing arbitration bears the burden of demonstrating that they fall within an exemption under the FAA. *See Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 227 (1987) (citation omitted). Thus, "a court should decide for itself whether § 1's 'contracts of employment' exclusion applies before ordering arbitration." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 537 (2019).

Although the FAA specifies the procedures for enforcing an arbitration agreement, "[a] federal court must apply state contract law principles when determining whether an arbitration agreement is valid and enforceable." *Nesbitt v. FCNH, Inc.*, 74 F. Supp. 3d 1366, 1371 (D. Colo. 2014). Similarly, "[t]he scope of an arbitration agreement . . . is a question of state contract law." *Reeves v. Enter. Prod. Partners, LP*, 17 F.4th 1008, 1011 (10th Cir. 2021).

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint

5

must contain sufficient factual matter, accepted as true and interpreted in the light most favorable to the non-moving party, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Additionally, the complaint must sufficiently allege facts supporting all the elements naaecessary to establish an entitlement to relief under the legal theory proposed; however, a complaint may be dismissed because it asserts a legal theory not cognizable as a matter of law. *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007); *Golan v. Ashcroft*, 310 F. Supp. 2d 1215, 1217 (D. Colo. 2004). A claim is not plausible on its face "if [the allegations] are so general that they encompass a wide swath of conduct, much of it innocent," and the plaintiff has failed to "nudge[ the] claims across the line from conceivable to plausible." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). In assessing a claim's plausibility, legal conclusions contained in the complaint are not entitled to the assumption of truth. *See Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). The standard, however, remains a liberal pleading standard, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotations and citation omitted).

## IV. ANALYSIS

UPS asserts that § 1 of the FAA's exception for employment contracts for "any other class of workers engaged in foreign or interstate commerce" does not apply to Plaintiff because his work occurs entirely within Colorado and does not involve working with vehicles that travel in interstate commerce (D. 38 at 8-12). Even if the exception does apply, UPS argues the class claims under

6

both the HFWA and Wage Act must be dismissed pursuant to a class waiver (*id*. at 13-16). Finally, UPS argues that Plaintiff's third claim must be dismissed because it arises under the CBA and is therefore preempted by federal labor law (D. 39). The Court addresses these arguments in turn.

### A. Plaintiff is in a Class of Workers Engaged in Interstate Commerce.

Recent U.S. Supreme Court precedent has provided an analytical framework for determine whether a class of workers falls within the § 1 of the FAA. In *Southwest Airlines Company v. Saxon*, 596 U.S. 450 (2022) (*Saxon*), the Supreme Court resolved a circuit split and held that courts should focus on the relevant class of workers to which a plaintiff belongs and if that class of workers is engaged in interstate commerce. In assessing § 1's applicability, courts first "define the relevant 'class of workers' to which [a plaintiff] belongs [and then] determine whether that class of workers is 'engaged in foreign or interstate commerce.'" *Id.* at 455. In considering whether a "class of workers" falls within the exception, courts should look to "the actual work that the members of the class, as a whole, typically carry out." *Id*. at 456. The Supreme Court declined to classify the plaintiff in *Saxon* under a broad class of "airline workers" and, instead, found he "belongs to a class of workers who physically load and unload cargo on and off airplanes on a frequent basis." *Id*. at 456.

Considering the statutory language "engaged in foreign or interstate commerce," the Supreme Court explained that "to be 'engaged' in something means to be 'occupied,' 'employed,'" or 'involved' in it" and noted that "commerce" included transporting goods. *Id*. at 457. The Court found that the class of airplane cargo loaders fit the requirement of transportation workers subject to the § 1 exemption because they were "actively 'engaged in transportation' of those goods across borders via the channels of foreign or interstate commerce." *Id*. at 458 (quoting *Cir. City Stores,*

7

*Inc. v. Adams*, 532 U.S. 105, 121 (2001)).  Such workers were "intimately involved with the commerce (e.g., transportation) of that cargo." *Id*.  Further, at the point they were involved, "there could be no doubt that interstate transportation is still in progress, and that a worker is engaged in that transportation, when she is doing the work of unloading or loading cargo from a vehicle carrying goods in interstate transit." *Id*. at 458–59 (alterations and quotation marks removed).  The Supreme Court considered the cargo loaders a clear-cut case, but it noted that the "answer will not always be so plain when the class of workers carries out duties further removed from the channels of interstate commerce or the actual crossing of borders."  *Id*. at 457 n.2 (citing *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 915 (9th Cir. 2020); *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 803 (7th Cir. 2020)).

This year, the Supreme Court took up the related issue of "whether the exemption from coverage under [FAA § 1] for any 'class of workers engaged in foreign or interstate commerce' is limited to workers whose employers are in the transportation industry." *Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246, 249 (2024) (quoting 9 U. S. C. § 1).  It found that a class of workers in the bakery industry potentially fell within the exemption so long as they met the established test that "any exempt worker must at least play a direct and necessary role in the free flow of goods across borders."  *Id*. at 256 (quotation marks omitted).[3]

UPS argues that Plaintiff's class of workers do not fall within the exemption because they are not "intimately involved in the transportation of goods across borders" and, unlike the workers in Saxon, do not "physically load or unload cargo onto vehicles that transport goods across state

---

[3] This Supreme Court decision was perfectly anticipated by U.S. District Judge Charlotte N. Sweeney in *Brock v. Flowers Food, Inc.*, 673 F. Supp. 3d 1180, 1182 (D. Colo. 2023), which held that certain bakery workers fell within the exemption.

8

lines" (D. 38 at 10).  UPS notes that Plaintiff is "5 to 17 workers removed from transporting a package across state lines" and argues that applying the exemption to him "would exempt all workers touching any good that crossed state lines" (*id*. at 12).  According to UPS, its local delivery drivers do not play a "necessary role in the transportation of goods across state lines" (*id*. at 13).  The Court disagrees with UPS's analysis.

Although the Supreme Court used the terms "intimately involved" and "necessary role" in its decisions, it did not require that a class of workers be intimately involved with or play a necessary role in the transportation of goods across state lines to fall within the exemption.  Rather, it merely required that such workers be "actively engaged in transportation of those goods across borders via the channels" of commerce.  *Saxon*, at 458.  Or, in its alternative framing, required the class of workers "play a direct and necessary role in the free flow of goods across borders." *Bissonnette*, at 256.  UPS's reading of the Supreme Court's decisions is far too narrow.  Although the classes of workers in *Saxon* and *Bissonnette* dealt with goods immediately after those goods were transported across borders, the Supreme Court did not make this a requirement.

The Court finds the two decisions cited favorably in *Saxon* as addressing more difficult circumstances particularly persuasive in resolving this case.  It *Rittman*, the U.S. Court of Appeals for the Ninth Circuit found that Amazon's AmFlex drivers, who play a similar role in last-leg delivery to Plaintiff here, fell within the exemption.  The Ninth Circuit reasoned:

> Amazon packages do not "come to rest," at Amazon warehouses, and thus the interstate transactions do not conclude at those warehouses.  The packages are not held at warehouses for later sales to local retailers; they are simply part of a process by which a delivery provider transfers the packages to a different vehicle for the last mile of the packages' interstate journeys.  The interstate transactions between Amazon and the customer do

9

not conclude until the packages reach their intended destinations, and thus AmFlex drivers are engaged in the movement of interstate commerce.

*Rittman,* 971 F.3d at 916.  By contrast, the U.S. Court of Appeals for the Seventh Circuit found that the last-leg delivery drivers in *Wallace* did not fall within the exemption.  *Wallace*, 970 F.3d at 803.  Those workers merely picked up food from local restaurants on behalf of Grubhub and made deliveries.  *Id*. at 799.  The Seventh Circuit reasoned that a "package of potato chips, for instance, may travel across several states before landing in a meal prepared by a local restaurant and delivered by a Grubhub driver," but this did not show the workers "occupations are centered on the transport of goods in interstate or foreign commerce." *Id*. at 802.

Although this persuasive authority predates the Supreme Court's decisions, this portion of its analysis is entirely consistent with those later binding decisions because it looks to the worker's role.  It provides a workable framework to answer the more difficult questions in cases where a "class of workers carries out duties further removed from the channels of interstate commerce or the actual crossing of borders."  *Saxon,* at 457 n.2.  Additionally, by looking to whether the transportation transaction is interstate and the worker's role is centered on interstate transport of goods, this authority avoids the pitfall of sweeping in all goods that travel in interstate commerce.  *See Wallace*, 970 F.3d at 802 (discussing the same concern).  In fact, UPS urges that the Court should look to whether the "interstate movement of goods is a central part of the class members' job description" (D. 38 at 11 (citing *Wallace* and others)).

Applying this analytical framework, the Court finds that Plaintiff is among a class of transportation workers that "play a direct and necessary role in the free flow of goods across borders" and, therefore, are subject to the exemption.  *Bissonnette*, at 256.  The evidence shows that a significant portion of the packages that Plaintiff handles, indeed a significant majority, are

traveling in interstate commerce. Although Plaintiff is several employees removed from the actual crossing of borders, the packages do not come to a rest and are not, for example, held at warehouses or opened and used to provide ingredients before reaching their ultimate destination. Thus, although he is somewhat removed from the crossing of borders, Plaintiff's class of workers is directly involved in the channels of interstate commerce and moving goods in interstate commerce is a central part of the class's job duties. His role is necessary to the free flow of goods in intrastate commerce as "simply part of a process by which a delivery provider transfers the packages to a different vehicle for the last mile of the packages' interstate journeys." *Rittman,* 971 F.3d at 916. Because Plaintiff is a member of an exempt class of employees, the Court will not compel arbitration of his claims under the FAA.

### B. Plaintiff's Class Waiver is Specifically Limited to Arbitration.

UPS argues that the class waiver in the Arbitration Agreement Plaintiff signed should be applied to dismiss the class claims (D. 38 at 3, 13–16). Plaintiff responds that the "class action waiver does not apply in court" because it only "prohibits class actions in arbitration" (D. 44 at 16). The Court agrees that this is the correct interpretation of the Arbitration Agreement's terms.

The class action waiver is part of a standalone "Arbitration Agreement" contract and provides that there "will be no right or authority for any dispute to be brought, heard or arbitrated as a class action and the Arbitrator will have no authority to hear or preside over any such claim" (D. 38-1 at 115). This provision is, by its unambiguous terms,[4] limited to rights and authority in

---

[4] To the extent that there is any ambiguity, it must be construed against the drafter. *Globe Nat. Bank v. McLean*, 269 P. 9, 10 (Colo. 1928); *see also Young v. Fidelity Union Life Insurance Co.*, 597 F.2d 705, 707 (10th Cir.1979) (citing *Unigard Insurance Co. v. Studer*, 536 F.2d 1337, 1339 (10th Cir.1976)). Applying this principle would lead to the same result. *See Hecla Min. Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083, 1091 (Colo. 1991) ("Terms used in a contract are ambiguous when they are susceptible to more than one reasonable interpretation." (citing *N. Ins. Co. of New York v. Ekstrom*, 784 P.2d 320, 323 (Colo. 1989)).

11

Case No. 1:23-cv-00647-SKC-TPO   Document 59-2   filed 11/15/24   USDC Colorado
pg 12 of 15

an arbitration.[5]  *See Bledsoe Land Co. LLLP v. Forest Oil Corp.*, 277 P.3d 838, 842 (Colo. App. 2011) ("courts may not rewrite clear and unambiguous contract provisions").  The agreement refers in various places to a "court of competent jurisdiction," but it places no similar limits on the authority of such courts, only arbitrators (D. 38-1 at 113–15).  In fact, rather than prohibiting class claims in court, it provides that, where the class waiver is found void or severed, "the class action must be litigated in a civil court of competent jurisdiction—not in arbitration" (*id*. at 115).

Although, as UPS notes, the waiver section of the Arbitration Agreement generically asserts that the "Company and you agree to bring any claim on an individual basis and not on a class and/or collective action basis," this does not contradict the Court's interpretation (*id*. at 114). This sentence and the remainder of the class waiver section falls within a portion of the agreement that chronologically specifies how an arbitrator is selected, how the arbitration is started for "the claim" or "the claim(s)," that claims will not be brought as a class, how discovery will be conducted under the arbitration rules, how the arbitration will be paid for, and how an arbitration award will issue and be enforced (*id*. at 114–16).  Before and after this chronological recitation of how arbitrations are conducted under the agreement that includes the class waiver, there are separate sections limiting the agreements applicability and specifying how the Arbitration Agreement should be applied (*id*. at 112–13, 116).  Thus, the context the waiver is found in the broader Arbitration Agreement indicates that it specifically governs arbitrations under the agreement and not other proceedings.  *See Moland v. Indus. Claim Appeals Office*, 111 P.3d 507, 510 (Colo.App. 2004) ("The meaning and effect of a contract is to be determined from a review

---

[5] Reinforcing this interpretation, there is a parallel provision regarding "collective actions" and limiting the power of arbitrators in such actions (*id*.).  There is no parallel limitation on the power of courts to hear class actions (*id*.).

of the entire instrument, not merely from isolated clauses or phrases."). Additionally, the Arbitration Agreement specifically limits its applicability to arbitration proceedings in two places (D. 38-1 at 112 ("All disputes covered by this Agreement will be decided by a single arbitrator through final and binding arbitration and not by way of court or jury trial.") (emphasis removed) and at 116 ("YOU . . . AGREE TO THIS AGREEMENT TO ARBITRATE ALL POTENTIAL CLAIMS COVERED BY THIS AGREEMENT.)). *See First Christian Assembly of God, Montbello v. City & Cnty. of Denver*, 122 P.3d 1089, 1092 (Colo. App. 2005) ("A contract should be interpreted to harmonize and, if possible, to give effect to all its provisions."). Thus, the Arbitration Agreement, and particularly the chronological sections setting out the arbitration process that includes that class wavier, do not control how claims will proceed in court.[6] Accordingly, the Court will not dismiss Plaintiff's class claims and denies the Motion to Compel.

### C. Plaintiff's Third Claim is Preempted by Federal Labor Laws.

Section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185(a), preempts claims that allege: (1) violations of a CBA or (2) claims that are "substantially dependent upon analysis" of a CBA to resolve. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985); *see also Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 413 (1988) (holding a state law claim is preempted when it "requires the interpretation of a collective bargaining agreement").

---

[6] Even if the class action waiver would apply to claims in court under the terms of the agreement, Colorado law would render it void at least with respect to Plaintiff's Wage Act claims. The Colorado Supreme Court held the "plain language of the [Wage Act] establishes that the General Assembly intended Colorado employees to be able to recover past due wages by filing a civil action in the Colorado courts" and that the relevant provision, now Colo. Rev. Stat. § 8-4-121, "implements this policy by protecting employees against contractual waiver or modification of these substantive and procedural rights." *Lambdin v. Dist. Ct. In & For 18th Jud. Dist. of Cnty. of Arapahoe*, 903 P.2d 1126, 1130 (Colo. 1995). In protecting Colorado employees' procedural rights and preventing their waiver, the statute must protect their right to vindicate those rights through procedural mechanisms such as discovery, trial by jury, and class actions that would apply in such civil actions.

13

"When Section 301 preempts a state law claim, the court must dismiss the claim or treat it as a claim for breach of the CBA brought pursuant to Section 301." *Adkins v. U.S. W. Commc'ns, Inc.*, 181 F. Supp. 2d 1189, 1199 (D. Colo. 2001).

UPS asserts that the alleged agreement to pay at least eight hours of wages for each day worked regardless of actual hours worked is contained within the CBA and, therefore, preempted (D. 39 at 2 ("It is indisputable that the only agreement, requirement, or 'guarantee' to pay Plaintiff eight hours of pay arises under the CBA.")). Plaintiff admits that this agreement is found in the CBA but argues that its claim is not preempted (D. 40 at 2). He asserts that the relevant provisions of the CBA are unambiguous and that claims are not preempted because the Court must merely reference the CBA (*id* at 9). The Court disagrees.

Each of Plaintiff's allegations in Claim Three "directly relates to either explicit or implied rights derived from the CBA." *Johnson v. Beatrice Foods Co.*, 921 F.2d 1015, 1020 (10th Cir. 1990). It cannot be determined whether UPS violated its payment obligations without determining whether the payment was required under the CBA. Plaintiff has not identified any independent right under Colorado law that would entitle him to payment in the circumstances he alleges. Rather, UPS's performance would have to be judged in relation to the CBA. In applying Section 301, "federal courts look beyond the allegations of the complaint . . . to determine whether the wrong complained of actually arises in some manner from a breach of the defendants' obligations under a collective bargaining agreement." *Mock v. T.G. & Y. Stores Co.*, 971 F.2d 522, 530 (10th Cir. 1992) (quoting *United Assoc. of Journeymen and Apprentices of the Plumbing and Pipefitting Industry v. Bechtel Power Corp.*, 834 F.2d 884, 888 (10th Cir.1987), *cert. denied*, 486 U.S. 1055 (1988)). Here, the Court need not look far to determine that Plaintiff alleges he was wronged by

14

a breach of the CBA. Any "analysis of whether [UPS] acted properly or not will inevitably require an analysis of what the CBA" required without reference to an independent standard under Colorado law. *Id*. Such claims are preempted. *Mowry v. United Parcel Serv.*, 415 F.3d 1149, 1157 (10th Cir. 2005). *Mowry v. United Parcel Serv.*, 415 F.3d 1149, 1157 (10th Cir. 2005). Accordingly, the Court dismisses Plaintiff's Claim Three.[7]

## V. CONCLUSION

Accordingly, it is ORDERED that the Renewed Motion to Compel Individual Arbitration of Plaintiff's First and Second Claims, Dismiss Plaintiff's Putative Class Claims and Stay This Action (D. 38) is DENIED and the Renewed Motion to Dismiss Plaintiff's Third Claim for Relief Pursuant to Fed. R. Civ. P. 12(b)(6) (D. 39) is GRANTED. It is FURTHER ORDERED that Plaintiff's Claim Three is DISMISSED without prejudice.

DATED November 13, 2024.

BY THE COURT:

Gordon P. Gallagher
United States District Judge

---

[7] Plaintiff does not request that, as an alternative to dismissal, the Court treat the claim as a Section 301 claim (D. 40 at 12).

15